Geoffrey S. GAVETT et al., Plaintiffs,

v.

Clifford L. ALEXANDER et al., Defendants.

Civ. A. No. 78–2130.

United States District Court, District of Columbia, Civil Division.

Sept. 4, 1979.

---

Leonard B. Simon, Arnold & Porter, S. Mark Tuller, Washington, D. C., for plaintiffs.

Kenneth M. Raisler, Asst. U. S. Atty., Dept. of Justice, Stephen N. Shulman, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

This action challenges the constitutionality of 10 U.S.C. § 4308(a)(5) which directs the Department of the Army to sell firearms at cost to members of the National Rifle Association of America (NRA).[1] It is claimed by plaintiffs that the statute violates their rights under the First Amendment and under the equal protection guarantee of the Fifth Amendment.

### I

Section 4308(a)(5) establishes a firearms sales program as part of a larger Civilian Marksmanship Program which, among other things, provides for the construction and maintenance of rifle ranges; helps to administer rifle matches; and instructs civilians in marksmanship. See 10 U.S.C. § 4307–13. The program, which is overseen by the National Board for the Promotion of

---

1. The statute reads as follows:

(a) The secretary of the Army, under regulations approved by him upon the recommendation of the National Board for the Promotion of Rifle Practice, shall provide for—

(5) the sale to members of the National Rifle Association, at cost, and the issue to clubs organized for practice with rifles arms, under the direction of the National Board for the Promotion of Rifle Practice, of the arms, ammunition, targets, and other supplies and appliances necessary for target practice.

Plaintiffs also challenge Army Regulation 725–1, Section II, para. 5–5(d), 32 C.F.R. § 621.2(e)

Rifle Practice (NBPRP),[2] was initiated in 1903 for the purpose of improving marksmanship skills among citizens in order that those called to military service might be more proficient marksmen and require less training.[3] In 1905 Congress authorized the sale of Army firearms to rifle clubs affiliated with the NRA (P.L. 58–149, 33 Stat. 986), and in 1924 it enacted the present statute by way of a floor amendment to the War Department's Appropriations Act of 1924 (P.L. 68–213, 43 Stat. 509–510).[4]

Since the time of the enactment of the statute, the Army has been selling rifles to members of the NRA at cost, that is, at prices substantially below market.[5] Sales figures for the early years are unavailable, but after World War II rifles were sold in substantial numbers. During the period 1960 to 1967 the Army sold tens of thousands of firearms each year to NRA members, including rifles, shotguns, and pistols.[6] In 1968 the program was reduced substantially, apparently because of the Vietnam war. While the Army plans to sell only 600 M–1 rifles in 1979, the Director of the Civilian Marksmanship Program and the NBPRP proposed in November 1977 that the program again be expanded to the levels existing prior to 1968.

In order to be eligible for the sales program[7] an individual must be a United States citizen over the age of 18, a current member in a local or state gun group, and a current member in the NRA, and he must produce evidence of current competitive shooting activity with high-powered rifles.[8] Only the NRA membership requirement is being challenged in this action. But see Part VII infra.

The Civilian Marksmanship Program has been the subject of considerable political controversy. A study conducted for the Army in the 1960s by the Arthur D. Little consulting firm recommended that the requirement of NRA membership for rifle purchases be eliminated. In 1977, the Administration proposed that the program be discontinued because of the "introduction of sophisticated weaponry and revisions of war time tactics." A similar proposal for abolition is contained in an annual report of the President dated January 22, 1979. On the other hand, an attempt by Senator Kennedy of Massachusetts to eliminate the program from the 1978 budget was defeated in the Senate by a wide margin (114 Cong.Rec. 12291–93 (daily ed. July 19, 1977)), and the Investigations Subcommittee of the House Armed Services Committee recommended last year that some several hundred thousand surplus rifles scheduled for destruction be sold instead in unlimited quantities under the auspices of the Civilian Marksmanship Program.

Plaintiffs in this action are the National Coalition to Ban Handguns (NCBH) and one Geoffrey S. Gavett. NCBH, an independent corporation, formerly affiliated with the Methodist Church, is an umbrella

which incorporates the statutory requirement of NRA membership. If the statute is invalid, so is the regulation.

2. 10 U.S.C. § 4308(a). The program is administered by the Director of Civilian Marksmanship. 32 C.F.R. § 543.4(j).

3. The usefulness of the Civilian Marksmanship Program during World War II was attested to, among others, by President Truman and General George Marshall. See Federal Firearms Act: Hearings on S.1 before the Subcommittee to Investigate Juvenile Delinquency of the Senate Judiciary Committee, 90th Cong. 1st Sess. pp. 484–5 (1967).

4. The basic purpose of the amendment was the development of shooting skills among men of military age by giving them opportunities for rifle practice. 65 Cong.Rec. 9884–9888.

5. For example, the M–1 rifle may be currently purchased by NRA members for $112, although it would cost between $250 and $1,000 if purchased elsewhere.

6. In 1961, more than 77,000 rifles, 37,000 pistols, and 4,300 shotguns were sold in this manner.

7. The sales program is governed by 10 U.S.C. § 4308(a)(5) and by an Army Regulation codified in 32 C.F.R. § 621.2(e) and (f).

8. This requirement is satisfied by proof that the applicant has fired at least fifty shots on conventional courses of fire or has attended the small arms firing school that accompanies the National Matches (see 10 U.S.C. § 4312).

organization of various groups which favor gun control, and it actively lobbies in support of that program. The individual plaintiff, a resident of Maryland, has expressed a wish to purchase a rifle under the Civilian Marksmanship Program. He meets all the requirements for purchase except membership in the NRA, claiming that he does not wish to join the NRA because he disagrees with its political goals. He applied for the purchase of a rifle in the 1979 sale [9] but was advised that no waiver of the requirement of membership in the NRA could be granted in view of the requirements of the statute. This action challenging the constitutionality of the law followed.

The National Rifle Association, upon its application, was allowed to intervene in this litigation. A principal objective of that organization, which has more than one million members, is the protection of the ability to acquire, possess, and carry guns, but it also fosters improved marksmanship and other related matters. NRA's legislative lobbying and political contribution campaigns in opposition to firearms regulation are financed through a Political Victory Fund.[10] Legislative lobbying is managed by the NRA Institute for Legislative Action (ILA).[11] ILA's general operations (salaries and administrative costs) are paid for with NRA's general revenues, and other ILA expenses are funded by direct contributions to the Institute.

## II

The Army and the NRA argue that neither the NCBH nor Gavett has standing to

pursue this lawsuit. Although the NCBH may well have standing (see *Buckley v. Valeo*, 424 U.S. 1, 11, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)),[12] it is unnecessary fully to explore that issue, for Gavett's standing cannot seriously be doubted.

The standing concept is implicit in the requirement of Article III of the Constitution that a court may decide only a "case or controversy," that is, it may not decide hypothetical questions or provide advisory opinions to parties who would not be injured if they did not prevail. As the Supreme Court stated in *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), the question on standing is whether plaintiff has "alleged such a personal stake in the outcome of a controversy as to assure that concrete adverseness which sharpens the presentation of issues [on] which the Court so largely depends for illumination of difficult constitutional questions." Standing requires a "fairly traceable" causal connection between the claimed injury and the challenged conduct. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); see also *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Orr v. Orr*, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The stake a plaintiff must have in the outcome of a suit to achieve standing need not necessarily be economic, but it may involve

---

9. Gavett also applied in 1978 but received no response from the Army. However, his unsuccessful application was retained by the Army for the 1979 sale. Nevertheless, he wrote again in 1979, and, as noted, he was informed that no waiver would be granted. The Army also suggested that the 1979 letter did not contain all the necessary information, but that information was submitted subsequently.

10. The Fund makes campaign contributions to candidates, and the NRA took an active role in 258 political campaigns in 1978. Certain postal privileges were withdrawn from the NRA because of its political nature. *National Rifle Association v. United States Postal Service*, 407 F.Supp. 88 (D.C.) (Flannery, J.).

11. The NRA expends substantial revenues derived from membership dues on lobbying, although only a small amount of each member's dues is expended on these activities.

12. The NCBH claims that it is the principal political opponent of the NRA on gun control legislation, and that the rifle sale program subsidizes the NRA in this regard, by giving it increased funds, increased membership (of individuals seeking to purchase guns at a discount), and political legitimacy and prestige— all to the detriment of the NCBH. According to NRA's reports, its membership increased during periods of increased rifle sales by the Army.

such intangible values as political or social concerns. *United States v. SCRAP*, 412 U.S. 669, 686–87, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Buckley v. Valeo, supra.*

Plaintiff Gavett claims, quite simply, that he has the requisite personal stake in this controversy by virtue of the fact that he wishes to purchase a rifle from the government at a discount price but is being denied that opportunity because the act reserves it exclusively to members of the NRA. Clearly, plaintiff would be able to purchase an Army rifle at a discount but for the NRA membership requirement imposed by the statute, and he is thus "injured" by it. It is equally clear that, should he prevail in this lawsuit the injury would be redressed: he would be able to purchase a rifle at the same price as NRA members. Under the most elementary rules of standing, jurisdiction, and case or controversy, Gavett qualifies as a plaintiff.

The NRA does not quarrel with this analysis in principle but instead challenges Gavett's good faith, claiming that he is a "contrived" plaintiff, and that therefore neither is he suffering genuine injury from the statute (or the program that it establishes) nor would a victory in this litigation provide him with genuine redress. In this regard, it is said that the NCBH, recognizing possible standing problems insofar as it was concerned, decided to bring Gavett in as an additional plaintiff to overcome those problems. Gavett, according to the NRA, was not interested in shooting guns prior to his involvement in this action nor had he ever heard of the Civilian Marksmanship Program, but bought a rifle, joined a rifle club, and participated in a rifle match solely to attempt to qualify for the weapons sales program.

It has long been settled by the decided cases, including a number of decisions of the Supreme Court, that an individual does not forfeit his standing for jurisdictional purposes merely because he is a "test" plaintiff. For example, in *Evers v. Dwyer*,

358 U.S. 202, 204, 79 S.Ct. 178, 180, 3 L.Ed.2d 222 (1958), a black resident of Memphis, Tennessee, boarded a bus in that city apparently solely for the purpose of testing segregated seating. The District Court dismissed the complaint on standing grounds but the Supreme Court summarily reversed, stating that the fact "[t]hat the appellant may have boarded this particular bus for the purpose of instituting this litigation is not significant." Similarly, in *Meyers v. Pennypack Woods Home Ownership Ass'n.*, 559 F.2d 894, 898 (3rd Cir. 1977), a black resident of New York applied for housing in Philadelphia. A District Court holding that his status as a tester barred him from relief for lack of a personal interest or stake was reversed by the Court of Appeals which noted that "[e]ven assuming arguendo that Meyers' application [for housing] was in fact motivated solely by his desire to test the legality of [the] policies, such a purpose is sufficient to confer standing." Again, in *Pierson v. Ray*, 386 U.S. 547, 558, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), Chief Justice Warren indicated for the Court that white and black clergymen who had traveled to Jackson, Mississippi, solely to test laws which segregated the facilities at an interstate bus terminal had standing to sue under the civil rights law on account of their false arrests even if they went to the Jackson bus terminal for the sole purpose of testing their rights to unsegregated public accommodations. See also *Smith v. YMCA*, 462 F.2d 634, 645–646 (5th Cir. 1972); *Hughes v. Dyer*, 378 F.Supp. 1305, 1308 (W.D.Mo.1974).[13]

Under the lack-of-good-faith rubric, the NRA further argues that Gavett is precluded from bringing this lawsuit because of his membership in the Maryland & D.C. Rifle & Pistol Association, a rifle club affiliated with the NRA, and because he will allegedly be unable to certify, as required, that it is his intention to purchase an Army rifle for his own use. Neither contention is well taken.

---

**13.** Defendants seek to distinguish these decisions on the theory that they involved blacks, and that blacks may be deemed to have an interest in the elimination of segregation wherever it may occur. However, none of the cited cases turns on such a racial rationale.

The record shows that the Maryland-D.C. Association advised Gavett that it is neither affiliated with the NRA nor engaged in lobbying or other political activities. The Association in fact, does remit $10 in annual dues to the NRA (and the NRA is, of course, engaged in lobbying and political activities), but it is difficult to see on what theory this circumstance might impair plaintiff's standing. Gavett's membership in the local rifle club demonstrates nothing more than that, in order to qualify for the sale of a rifle, he was willing to comply with those requirements which least offended his beliefs.[14] In addition to requiring membership in the NRA, the pertinent Army regulation (see 32 C.F.R. § 621.2(e), (f)) requires membership in a local rifle club, and plaintiff was thus faced with the Hobson's choice of not joining the local association (and being confronted with an argument that he could not challenge the "membership in the NRA" requirement of the statute because of that fact) or joining a local club with its *de minimis* relationship to the NRA. Gavett chose the latter, and that choice does not detract from his standing to bring this action, any more than a principled opponent of racial segregation would have lacked standing prior to *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) to attack unequal expenditures for black schools under the then prevailing separate-but-equal doctrine.

Insofar as the argument concerning plaintiff's future certification is concerned, he has stated that, should he be sold a rifle, he would place it in the custody of his brother-in-law, for their joint use, and that he will, and will be able to, certify that he is purchasing the gun for his "personal use and not for resale or other disposition," and for use in competitive marksmanship, as required by the Army. Plaintiff's good faith in that regard has not been successfully challenged. Moreover, it is worth noting that members of the NPA who apply for the purchase of rifles under the program are never tested or examined as to their bona fides and may make the purchases based simply upon declarations similar to that made by this plaintiff.

### III

The government and the NRA advance various arguments concerning the appropriateness of the controversy for judicial consideration. Thus, the NRA argues that the issue raised by Gavett's complaint is not "ripe;" the government makes the related point that plaintiff has failed to exhaust his administrative remedies; and both sets of defendants suggest that the dispute is political and hence not justiciable. The ripeness-exhaustion argument advanced by defendants may be summarized as follows. The Maryland lottery for 1979 has not yet been held;[15] it is not certain that, when that lottery is held, Gavett will be selected to purchase a rifle; therefore the constitutionality of the statute as applied to him is hypothetical and conjectural.[16]

This argument is fatally flawed both because Gavett has already been denied an opportunity for the purchase of a rifle (since the Army refused to grant him a waiver from the statutory requirement of

14. Gavett holds views contrary to those of the NRA on gun control; he contributes to NCBH; and he has engaged in political campaigns, having chosen candidates in part because of their stands on gun control. The local rifle club appears to have no relationship to any of these matters.

15. Gavett wrote to the Army to apply for a rifle, requesting a waiver of the NRA requirement which the Army, in accordance with the statute refused. On February 15, 1979, the Court was advised by the Army that the Maryland lottery for the current year would be held without Gavett, and by stipulation that lottery was postponed pending the outcome of this litigation.

16. It is well established that a court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936); *Rabinowitz v. Kennedy*, 376 U.S. 605, 610–11, 84 S.Ct. 919, 11 L.Ed.2d 940 (1964); *Rescue Army v. Municipal Court*, 311 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947).

NRA membership),[17] and because under existing law he could not possibly lawfully obtain an Army rifle under the program. By the Army's interpretation of the statute—and indeed by the statute's plain words and the understanding of all the parties—his lack of membership in the NRA renders him ineligible for a rifle purchase. For that reason, it would be a wholly futile step to require him to exhaust the "remedy" of a participation in the lottery when, at the conclusion of the process, he would not and could not legally be permitted to purchase a rifle in any event. *Humana & South Carolina, Inc. v. Califano,* 191 U.S. App.D.C. 368, 379, 590 F.2d 1070, 1081 (D.C. Cir. 1978); *Wallace v. Lynn,* 165 U.S.App. D.C. 363, 367, 507 F.2d 1186, 1190 (D.C. Cir. 1974); *Lodge 1858, AFGE v. Paine,* 141 U.S.App.D.C. 152, 166, 436 F.2d 882, 896 (D.C. Cir. 1970); *American Federation of Government Employees v. Acree,* 155 U.S. App.D.C. 20, 23, 475 F.2d 1289, 1292 (D.C. Cir. 1973); *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 323, 510 F.2d 692, 703 (D.C. Cir. 1975).[18] Similarly, as the very decisions cited by the NRA demonstrate, lack of ripeness is an appropriate reason for deferring decision only where there remains a possibility that the plaintiff may achieve his relief by the action of a judicial or administrative tribunal (*Aircraft & Diesel Corp. v. Hirsch,* 331 U.S. 752, 772, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947)) or where his claim is barred in any event by a valid statute. *Storer v. Brown,* 415 U.S. 724, 736–7, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

Finally, the "political" arguments advanced by the parties are wholly unpersuasive. The government urges the Court not to decide this case because the President has suggested the repeal of the statute and because the Congress might act favorably on that request. Aside from the fact that the most recent action of the Congress was to reject repeal, the government has submitted no case support for the proposition that because a law might conceivably be repealed in the future, an aggrieved person may not have his rights adjudicated in the present. Equally lacking in merit is the contention made both by the government and by the NRA that this case presents a "political" as distinguished from a justiciable question. To be sure, the participation of the NRA in the Civilian Marksmanship Program, as well as that program itself, have been and are being debated in the political arena and in the Congress. But so have abortion, school prayers, busing, affirmative action, and many other controversial subjects, without undermining court jurisdiction where it otherwise exists under the Constitution or laws of the United States.

## IV

■ The Fifth Amendment to the Constitution prohibits the federal government, whether by statute or otherwise, to deny to any person the equal protection of the laws. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Plaintiff Gavett claims that he is being denied his right to equal protection by 10 U.S.C. § 4308(a)(5) in that this law prevents him from purchasing a rifle at a discount from the Army while granting such a right to members of the National Rifle Association who in every other respect have the same qualifications and are in every other way similarly situated.

Before proceeding to an analysis of the statute under equal protection standards, the positions taken by the executive and legislative branches of the government with respect to constitutionality are worth noting.

On May 8, 1979, the Department of Justice advised the Court that the Executive Branch would not defend the law against plaintiffs' claim of unconstitutionality. It

---

17. In this respect, the Army was of course acting properly because it lacks power to waive a condition imposed by law.

18. The Director of Civilian Marksmanship stated in his deposition that any effort by Gavett to obtain a rifle (other than joining the NRA or bringing an action in court) would have been futile.

is the position of the Army that the NRA membership requirement "serves no valid purpose that is not served as well or better by the various regulatory criteria adopted by the Army," and that of the Department of Justice that this requirement does not bear a rational relationship to any legitimate governmental interest and is therefore unconstitutional. The Department of Justice also addressed letters to the Vice President of the United States and the Speaker of the House of Representatives, in accordance with P.L. 95–624, 92 Stat. 3459, notifying them of the position it had taken in this litigation. It is the evident purpose of P.L. 95–624 to permit the Congress to act on its own to defend the constitutionality of legislation when the Executive Branch declines to do so. Accordingly, acting upon the request of the Department of Justice, this Court stayed further consideration of this case for a period of forty-five days in order to afford the Congress time to file its own defense of the statute should it choose to do so. No pleadings were submitted on behalf of the Congress, and the Court therefore proceeded to hear and determine constitutionality on the basis of the pleadings filed by the other parties, including the NRA.[19]

Intervenor National Rifle Association correctly points out that the Court is bound neither by the Executive Branch position that the statute is unconstitutional nor by the failure of the Congress to defend constitutionality. Obviously, it is the function of the courts ultimately to determine the constitutionality of federal actions and laws. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Nevertheless, the position of the other branches of government is not without significance. While occasionally the Executive Branch has declined to defend laws it considered to be unconstitutional (see, *e. g., Moses H. Cone Hospital v. Simkins,* 323 F.2d 959, 962 (4th Cir. 1963)),

such occasions are exceedingly rare. It is reasonable to assume that the Executive Branch and the Congress would not have failed to defend the instant law against constitutional attack without the weightiest of reasons,[20] that is, because they—or at a minimum the Executive—were convinced that a reasonable argument in support of constitutionality could not be made. Again, while such a determination is not binding upon the Court, it constitutes a significant circumstance which should be accorded some weight.

### V

 Entirely aside from this consideration, however, it is clear that section 4308(a)(5) is violative of the equal protection of the laws as guaranteed by the Fifth Amendment.

The standard of judicial review to be applied in an equal protection context depends upon the nature of the rights involved. If a fundamental interest of the plaintiff is affected,[21] the classification established by the government must pass "strict scrutiny;" *i. e.,* in order to be found valid, (1) the law must serve a compelling governmental interest and (2) it must do so by the means least intrusive upon the rights of the plaintiff. *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Kramer v. Union Free School District,* 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). By contrast, if fundamental interests are not affected, the statute, to pass constitutional muster, need only bear a rational relationship to a legitimate state objective. *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Thus, it is appropriate to determine first whether the interest asserted by plaintiff should be regarded as "fundamental" under the law.

First Amendment rights have always been held to be among the most fundamen-

---

**19.** The Department of Justice is supporting the NRA on issues other than constitutionality.

**20.** Article II, Section 3 of the Constitution requires the President to "take Care that the laws be faithfully executed . . . ."

**21.** The same standard is applied when a "suspect" classification—such as race—is employed.

tal interests (*Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)), and laws impairing First Amendment and similar basic rights directly or indirectly have not infrequently been struck down for that reason. See *Buckley v. Valeo, supra,* 424 U.S. at 65, 96 S.Ct. 612; *Harper v. Virginia Board of Elections,* 383 U.S. 663, 670, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); see also, *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Elrod v. Burns,* 427 U.S. 347, 359–60, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Dunn v. Blumstein, supra.*

Among the rights protected by the First Amendment is that to freedom of association (*Shelton v. Tucker, supra,* 364 U.S. at 485–86, 81 S.Ct. 247; *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)) and its corollary, the freedom *not* to be required to associate with groups holding views which an individual regards as obnoxious. The Supreme Court stated in *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977):

> A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'

Similarly, the First Amendment protects the rights to contribute to political and other causes (*Buckley v. Valeo, supra,* 424 U.S. at 16, 22, 96 S.Ct. 612) as well as the right *not* to contribute. *Abood v. Detroit Board of Education,* 431 U.S. 209, 234, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). As Thomas Jefferson said, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." I. Brant, James Madison: The Nationalist 354 (1948).

The instant statute infringes on these rights and freedoms. It directs that a person, in order to receive a government benefit [22]—the purchase of a rifle at a discount—must join the National Rifle Association, contribute dues to that organization, and pledge loyalty to its political goals.[23] In principle, this law is not substantively distinguishable from such statutes as a West Virginia law which required public school students, including Jehovah's Witnesses, to pledge allegiance to the American flag (*West Virginia Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)), and a New Hampshire law which prohibited automobile owners from obscuring the state motto "Live Free or Die" from their license plates (*Wooley v. Maynard, supra*); and such actions as that of the sheriff of Cook County, Illinois, who compelled government employees to pledge political allegiance to the Democratic Party and to contribute to it (*Elrod v. Burns, supra*).[23] Indeed, it would seem that at least some of the programs involved in those cases (*i. e.,* the requirement of allegiance to the American flag and that of the display of a state motto) represent substantially more compelling governmental interests than membership in the NRA; yet in none of these instances was the significance of the program regarded by the Supreme Court as sufficient to save the legislation from a challenge by individuals who considered it to be offensive to their rights and beliefs.

▮ First Amendment freedoms are of course not absolute but may be curtailed to avoid the clear and present danger of sub-

---

**22.** While the government may have no duty to furnish certain benefits, when it does decide to provide them, it may not condition the provision on a waiver of protected rights. See *Perry v. Sinderman,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Elrod v. Burns, supra,* 427 U.S. at 361, 96 S.Ct. at 2683 ("the denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve that which it may not command directly").

**23.** A recent amendment to the NRA bylaws requires its members to subscribe to the purposes of the NRA, including its political objectives.

stantive evils which Congress has a right to prevent. *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). It follows that a statute is valid even if it impinges upon First Amendment freedoms if it "further[s] some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end." *Elrod v. Burns, supra,* 427 U.S. at 363, 96 S.Ct. at 2685; see also, *Wooley v. Maynard, supra; Shelton v. Tucker, supra,* 364 U.S. at 488–89, 81 S.Ct. 247.

■■■ Although plaintiffs suggest otherwise, in the Court's view the Civilian Marksmanship Program may validly be regarded as achieving a vital government end. Notwithstanding the Administration's expressed belief that sophisticated warfare has diminished the need for reliance upon marksmanship, the Court is not prepared to hold that this statute, enacted by the Congress in the interest of national defense and never repealed,[24] does not further important public purposes. Certainly, the Court is not prepared to make the judgment—which Congress has refused to make—that marksmanship has become an obsolete or useless skill in today's armed forces.[25] But the issue in this case is not whether a civilian marksmanship program is in the national interest or arguably achieves an important governmental objective, but whether such interests and objectives call for the statutory direction contained in section 4308(a)(5) that only members of the NRA may purchase Army surplus rifles. On the constitutional question the inquiry therefore must be whether, in order to at-

tain the government's legitimate objective of developing a pool of trained marksmen, it is necessary to require membership in the NRA for potential purchasers of such rifles, including those who are opposed to the NRA's objectives. To put it another way, is the requirement of NRA membership "the means least restrictive" of First Amendment freedoms to achieve the government's legitimate end? The answer to that question must clearly be in the negative.

It is perfectly obvious that it is possible to encourage and improve civilian marksmanship by means other than the requirement of membership in the NRA. One such means which readily suggests itself is the continuation or expansion of what the Army is already doing—providing rifles, ammunition, targets, and awards to junior rifle clubs; helping to coordinate, administer, and support rifle matches; providing financial support to junior shooters attending competitions; and instructing civilians in marksmanship through the Small Arms Firing School. Alternatively, if it be deemed undesirable to involve the government more deeply in this activity, rifle sales might be held as at present, but without the requirement of NPA membership. Such a change would not dilute the quality of the potential rifle customers.[26] The program now requires both membership in a local or state rifle club and evidence of current competitive shooting activity as prerequisites to the purchase of a rifle, and those requirements are not affected by this action. See Part VII *infra.* Thus, to the extent that it is deemed essential that rifles

---

**24.** While, as indicated *supra,* neither the Executive nor the Congress is here defending the statute, efforts to repeal it have been unsuccessful.

**25.** Some have argued that in the era of mutual nuclear deterrence, means of conducting conventional warfare have again assumed more critical importance.

**26.** The Under Secretary of the Army has testified that the pre-1968 sales program "had nothing to do with marksmanship except accidentally [since] anybody who met the age and NRA qualifications could buy. . . ." Hearings on Department of Defense Appropriations for 1969, Defense Subcommittee of House Ap-

propriations Committee (April 24, 1968) p. 731. Moreover, the Army has indicated that, to the extent that elimination of the NRA requirement would cause any problem, it is fully able to cope with it. The government stated in response to an interrogatory propounded by the plaintiffs that if the NRA membership requirement were eliminated, "the existing Army regulations coupled with a more intensive screening process would be adequate to serve legitimate governmental interests. Implementing a more intensive screening process would not present substantial problems to the Director of Civilian Marksmanship."

be sold only to those who may be thought to be willing and able to use them, that aim is fully met by these two conditions—membership in the NRA is wholly redundant.[27]

Indeed, more than being redundant, such membership is only tenuously related to the objectives of the Civilian Marksmanship Program.[28] The NRA does not require the demonstration of experience in or proficiency with firearms as a prerequisite to membership: any U.S. citizen of "good repute" who can afford $15 in annual dues is able to join the National Rifle Association.[29] Nor is NRA membership restricted to those most likely to be called to arms in the case of hostilities;[30] there is no upper age limit.

The NRA argues that its members are more likely than others to be interested in shooting and acquiring guns, and that for this reason they should be given a special status in the rifle purchase program. Even if the premise were true—and that is not necessarily so [31]—the conclusion would still be a *non sequitur.* Elimination of the NRA–membership requirement from the statute will not preclude members of that organization from purchasing guns at whatever price may be set by the Army, including a discount; such an elimination will merely deprive NRA members of their monopoly status in that respect.

The NRA argument, most broadly, comes down to this: the training of civilian Americans in marksmanship is a program vital to this country's defense, and only the NRA can, as a practical matter, provide such training. As the discussion above indicates,

since there are obvious alternative means of training citizens of military age in marksmanship skills, that conclusion is incorrect. But even if the NRA were right in its assertion, it would not help its case, for its argument proves too much. Should it actually be true that significant aspects of the defense posture of the United States depend upon a private organization with distinct political and social aims,[32] that would be a reason for dissolving the symbiotic relationship between the Army and the NRA rather than for perpetuating it. It can hardly be regarded as in the interest of the government, much less to represent a compelling governmental interest, to perpetuate a monopoly on an important aspect of national defense in a private organization, however sincerely motivated and patriotic, particularly when that group is at the same time significantly engaged in lobbying the government and otherwise attempting to influence it on controversial public issues. The maintenance of such a monopoly position would not be in the governmental interest if it were occupied by the National Coalition to Ban Handguns, the American Civil Liberties Union, the AFL–CIO, the American Legion, or the U.S. Chamber of Commerce, and it can likewise not be regarded as representing a compelling governmental interest to have such a monopoly vested in the National Rifle Association.

The Supreme Court decision perhaps most directly pertinent to the equal protection issue in its First Amendment framework is *Abood v. Detroit Board of Educa-*

---

**27.** The civilian marksmanship program operated, apparently without difficulty, from 1903 to 1924 without the present requirement that sales may be made only to NRA members, and Col. Jack Rollinger, Director of Civilian Marksmanship of the Army, stated on deposition that he would have no objection if the NRA requirement were eliminated.

**28.** The rifle sales program does not depend upon the NRA. It is conducted by the Army without assistance from the NRA, and the principal relationship of the program to that organization is that only NRA members are eligible for the purchase of rifles.

**29.** As indicated *supra,* in 1978, the NRA added a requirement of agreement with its "objectives and purposes."

**30.** Compare note 4 *supra.*

**31.** It may well be that many individuals interested in shooting have joined the NRA only because it provides a relatively inexpensive access to firearms. Should the rifle purchase program and NRA membership be decoupled from one another, such persons might well engage in marksmanship activities outside the NRA framework.

**32.** Such as its opposition to the control of firearms, including handguns, in any form.

*tion,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). That case was the last in a line of cases involving the question of whether a government-sanctioned union shop clause is constitutionally valid (see *Railway Employees' Department v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956); *International Association of Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Lathrop v. Donohue,* 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (requirement of membership in unified Bar)), in all of which that issue was discussed but not finally resolved. *Abood* was a challenge by a number of public school teachers to a state law provision requiring them to join the majority-approved union or to pay a service charge equal to the union dues to the organization. The Supreme Court upheld the coercion implicit in the statute with respect to expenditures essential to the collective bargaining process (bargaining, contract administration, and grievance adjustment), but held it to be unconstitutional with regard to other activities in which the union was engaged. The teaching of that decision is relevant here in several respects.

*Abood* affirmed that government may require an individual to pay dues or to make other contributions to a private organization, but it limited that requirement to matters (such as stable labor relations) which represent a compelling governmental interest. The NRA argues that the promotion of marksmanship is just such an interest; plaintiffs contend that it is not. In the opinion of the Court, both sides are off the mark, for in the context of the *Abood* rationale they address the wrong issue.

The NRA is correct in its assertion that the governmental interest in the promotion of marksmanship, as part of the defense of the United States, may properly be regarded as being as compelling as the need for peaceful and stable labor relations was found to be in *Abood.* But that does not resolve the problem. The crux of the matter is that exclusive representation of employees by an organization is a central and essential element in industrial relationships and may validly be regarded as a sine qua non of peaceful and stable labor relations.[33] By contrast, membership in an organization is not an inherent prerequisite to better marksmanship. Improved marksmanship may sometimes be facilitated by group or organized practice, but it is obviously possible to become a competent marksman on an individual basis.[34] American history provides ample evidence of excellent marksmanship in war and peace long before there were national or local rifle clubs.

Thus, functionally the requirement that dues be paid to labor unions may legitimately be considered necessary to the achievement of the governmental objective of peaceful and stable labor relations; better marksmanship, on the other hand, though likewise a legitimate governmental objective, is capable of achievement outside an organizational framework, and certainly without a requirement that all those who wish to become better marksmen by means of the purchase of surplus Army rifles must pay dues to the NRA and pledge allegiance to its objectives.

Moreover, even in the sphere of labor relations, the *Abood* Court was careful to limit the coercion element to expenditures essential to the collective bargaining process, holding invalid expenditures for other union activities. Here, admittedly the NRA is engaged in legislative lobbying, making contributions to candidates for office, and

**33.** As the Supreme Court said in *Abood* (431 U.S. at 220–21, 97 S.Ct. at 1792):

The designation of a single representative avoids the confusion that would result from attempting to enforce two or more agreements specifying different terms and conditions of employment. It prevents inter-union rivalries from creating dissension within the work force and eliminating the advantages to the employee of collectivization. It also frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations.

**34.** Certainly it is possible to become a marksman without membership in a national organization, such as the NRA, even if it be assumed that membership in a local rifle club is useful.

other political actions, and general membership dues are used, at least in part, to finance these activities. These factors alone serve to invalidate the NRA–membership requirement of the statute under the *Abood* precedent.

For the reasons stated, it is the Court's conclusion that the subsection (5) of 10 U.S.C. § 4308(a) which requires membership in the National Rifle Association as a precondition to the purchase of Army surplus rifles unconstitutionally deprives plaintiffs of the equal protection of the laws in violation of the Fifth Amendment to the Constitution.

## VI

Even if it be assumed that fundamental interests of the plaintiffs are not affected by the statute and that it is therefore not required to pass the strict scrutiny test in order to be held constitutional but need only be rationally related to a legitimate governmental interest, the result is the same.

In order to be valid under the rational basis test, a classification

must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.[35]

Much of what has been said above with respect to the relationship of this law to legitimate governmental interests likewise applies to the issue of whether there is a rational basis for the statute. The classification it directs—membership or non-membership in the NRA—is not a rational means of promoting its professed objective, an improvement in marksmanship skills of individuals of military age. In that respect, the statute is both overinclusive (for it includes among potential purchasers of rifles all members of the NRA, irrespective of age or marksmanship) and underinclusive (because it does not permit persons to purchase rifles who are highly qualified marksmen but do not wish to join the NRA because they disagree with its philosophy). See *Eisenstadt v. Laird,* 405 U.S. 438, 446–55, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Barchi v. Sarafan,* 436 F.Supp. 775, 782–83 (S.D.N.Y. 1977) (three-judge court). Gavett would obviously not be a better marksman, military draftee, or Army volunteer, if he paid $15 annually in dues to the NRA, and he is no less capable of being an accurate shooter because he chose not to join the organization. In short, there is no rational basis for the statute and it is invalid even under the less rigid test for determining constitutionality.[36]

## VII

What remains to be considered is the question of relief. More specifically, it must be determined whether only subsection (5) is invalid or whether all of section 4308(a) must be struck down. The answer to that question depends upon whether under the appropriate canons of construction subsection (5) is severable from the remainder of the act.

It may be noted initially that only the government takes the position that the parts of section 4308(a) are not severable and that the statute must be upheld or invalidated in its entirety. Plaintiffs and the NRA do not support the government's argument in this regard,[37] although neither flatly argues that subsection (5) *is* severable from the remainder of the law which establishes the Civilian Marksmanship Program.

---

**35.** *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920); see also *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 489, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

**36.** The Department of Justice conceded the unconstitutionality of the law under this standard.

**37.** The reasons may be tactical. Plaintiffs may be concerned about their expectations of substantive success should the validity of the entire program be at issue, while the NRA may wish to preserve the remainder of the program if subsection (5) is declared invalid.

*Carter v. Carter Coal Co.,* 298 U.S. 238, 312–13, 56 S.Ct. 855, 873, 80 L.Ed. 1160 (1936) holds that the key question when an issue of severability arises is—"What was the intent of the lawmakers?" If a court concludes "that the legislature would not have been satisfied with the statute unless it had included the invalid part" (*Utah Power & Light Co. v. Pfost,* 286 U.S. 165, 184–85, 52 S.Ct. 548, 553, 76 L.Ed. 1038 (1932)), it must hold the law to be non-severable and declare all of it to be invalid. See also, *Gordon v. Executive Committee,* 335 F.Supp. 166 (D.S.C.1971). If, on the other hand, several parts of a statute are not mutually dependent upon one another, it is properly regarded as severable, and only the unconstitutional portion is struck down while the remainder continues to be valid.[38]

The government argues at considerable length that the legislative history conclusively demonstrates that the Congress would not have enacted the Civilian Marksmanship Program independently of the NRA membership requirement.[39] The difficulty with that argument is that Congress did just that—in effect it did enact the program without the NRA clause.[40]

In 1903, Congress enacted legislation which established annual matches for the military services and appropriated funds for trophies and medals. Pursuant to that legislation, the Secretary of War created the National Board for the Promotion of Rifle Practice to direct the matches. Two years later, Congress authorized the Secretary of the Army to sell rifles "for the use of rifle clubs formed under regulations prepared by the national board for the promotion of rifle practice and approved by the Secretary of War." 33 Stat. 986. The NBPRP rec-

ommended that civilian training should be accomplished with military guns, and that a number of such guns should be provided to rifle clubs for shooting practice. In 1916, the program was expanded to provide for the establishment and maintenance of rifle ranges for able-bodied males capable of bearing arms, and ammunition at these facilities. 39 Stat. 211. It was only in 1924, almost twenty years after the enactment of the first rifle-sale legislation, that the present statute requiring NRA membership was enacted by way of a floor amendment to the War Department Appropriations Act of 1924, as part of what in effect was a restructuring of the pre-existing programs. 43 Stat. 509–510.

While, to be sure, the 1924 statute established a more formal framework for the marksmanship program, its key ingredients—the sale of surplus rifles to local rifle clubs for use by affiliated civilians, the establishment of rifle ranges, and a national board to oversee the civilian marksmanship programs—existed long before then. The floor debates on the 1924 act focused almost exclusively on the benefits that might be achieved by subsidized civilian rifle practice vs. its cost to the taxpayers. The NRA as such was hardly ever mentioned. See 65 Cong.Rec. 9884–9888 (May 24, 1924). To the extent, therefore, that legislative intent and purpose on the severability question can be ascertained from the existing materials, it is quite clear that the essential question—whether Congress would have enacted the Civilian Marksmanship Program even if it did not include the NRA provision—can confidently be answered in the affirmative. Certainly that provision is not so interwoven with the remainder that all of it must fall together.

**38.** If the statute contains a severability clause, there is a presumption of severability; if, as here, there is no such clause, it is presumed that the statute is not severable. But in either event (see *Quittner v. Thompson,* 309 F.Supp. 684 (S.D.Fla.1970)), the issue is, as the Court put it in *Carter, supra,* whether the conclusion is justified that the legislature would have enacted the statute even if a motion to strike the offending provision (here subsection (5)) had passed while the bill was pending.

**39.** Memorandum in Support of Motion to Dismiss for Lack of Standing, pp. 7–11.

**40.** The history of legislation is a significant factor in determining the issue of severability. *Great Northern R. Co. v. United States,* 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942); *Tedesco v. United States,* 255 F.2d 35 (6th Cir. 1958).

The conclusion that the act is severable, and that the unconstitutionality of subsection (5) does not require a declaration of invalidity of the remainder, is also supported by general canons of statutory construction. It has long been held that courts have a duty to uphold legislation rather than to invalidate it if it is possible to do so, and that duty applies also in the context of the issue of severability. See *El Paso & Northeastern Ry. Co. v. Gutierrez*, 215 U.S. 87, 30 S.Ct. 21, 54 L.Ed. 106 (1909); *Poe v. Menghini*, 339 F.Supp. 986 (D.Kan.1972). And even as early as 1931, Mr. Justice Cardozo observed (*People v. Mancuso*, 235 N.Y. 463, 175 N.E. 177, 180 (1931)), that "[t]he whole tendency during recent years . . . has been to apply the principle of severance with increasing liberality."

These principles are particularly cogent where, as here, the Court is confronted not with the problem of the invalidity of a statute with respect to some but not all of its applications—a problem which calls for the inclusion and exclusion of particular situations by way of interpretation and which for that reason has given rise to concerns about what has been called judicial legislation [41]—but with the far less difficult issue of the invalidity of a discrete part or section of a law. In that situation, the invalid part may simply be excised from the remainder, and the specter of judicial re-writing of legislation, raised by both the government and the NRA, is not present or at least not nearly as acute.

The nub of the matter is that if the general purpose of a law can be achieved without the invalid portion the remainder will be severed and will be upheld on its own. *El Paso Northeastern Ry. Co. v. Gutierrez, supra; Velazquez v. Hunter*, 159 F.2d 606 (10th Cir. 1947); *Gordon v. Executive Committee, supra; Creasy v. Stevens*, 160 F.Supp. 404 (W.D.Pa.1958); Sands, Statutory Construction § 44.05. The general purpose of the law involved in this litigation is to assist in providing the United States with marksmen for service to the country in the event of war. That purpose is achieved by section 4308(a) even if the NRA–clause is struck down. It follows that the invalidity of subsection (5) does not affect the remainder of the Civilian Marksmanship Program which therefore can and must be upheld.

For the reasons stated, the motions of the government and of the National Rifle Association to dismiss or for summary judgment will be denied, the motion of plaintiffs for summary judgment will be granted, and an order will be entered declaring invalid and enjoining the enforcement of 10 U.S.C. § 4308 and the implementing regulation insofar as they require that the sale of rifles by the Army may be made only to members of the National Rifle Association.

---

**41.** See *United States v. Reese*, 92 U.S. 214, 23 L.Ed. 563 (1875); Sands, Statutory Construction §§ 44.12–44.18.