NATIONAL RIFLE ASSOCIATION,
Plaintiff,

v.

DAYTON NEWSPAPERS, INC., dba
Dayton Daily News, et al.,
Defendants.

No. C–3–79–436.

United States District Court,
S.D. Ohio, W.D.

Feb. 1, 1983.

David H. Martin, Washington, D.C., Richard E. Gardiner, National Rifle Ass'n of America, Washington, D.C., William R. Coen, Dayton, Ohio, for plaintiff.

Robert P. Bartlett, Charles Horn, Dayton, Ohio, for defendants.

## DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; JUDGMENT TO BE ENTERED FOR DEFENDANTS; TERMINATION ENTRY

RICE, District Judge.

### I. *Introduction*

On December 21, 1979, the National Rifle Association (NRA) instituted the present defamation action against Dayton Newspapers, Inc., a corporation which publishes the Dayton Daily News, and against several employees of the Dayton Daily News,[1] based on the publication in the Dayton Daily News on December 28, 1978, of an editorial entitled "NRA again murders good sense."[2] In addition, the NRA sued

---

1. The individual defendants who are employees of Dayton Newspapers, Inc., are: David Easterly, President of Dayton Newspapers, Inc.; Arnold Rosenfeld, Editorial Director of the Dayton Daily News; Joseph Fenley, Managing Editor of the Dayton Daily News; Thomas Teepen, editorial page editor of the Dayton Daily News; and Hap Cawood, editorial writer for the Dayton Daily News. Defendant Charles Riesz left the employ of Dayton Newspapers, Inc., in October, 1980. As of January 26, 1981, Riesz was employed as the Editorial Page Editor of the Wilmington Morning Star in North Carolina. *See*, Doc. # 10, Ex. A.

2. The entire text of the editorial published in the Dayton Daily News is as follows:

NRA again murders good sense

The National Rifle Association has bagged another one.

This well-financed and well-organized group representing a fraction of the population has again shown its power on Capitol Hill by blocking the appointment of a man whose ideas on controlling crime as so conventional as to be cliches.

To the NRA, of course, persons holding such ideas are dangerous radicals.

The man is Norval Morris, dean of the Law School at that hotbed of crazed radicalism, the very establishment University of Chicago. Like many law enforcement experts and police officers, Mr. Morris is in favor of stricter gun control laws. He is smart enough to know that while, yes, people kill people, guns do more to help them do this than any other weapon.

Because he is opposed to people killing people, he is opposed to the kind of free availability of guns that virtually every other country in the world considers insane.

This makes him dangerous to the NRA, which is financed by the manufacturers of firearms and by the shooters who have been propagandized into zealous defenders of the companies' right to sell guns to just about anybody who has the folding green. People like Lee Harvey Oswald, the Rev. Jim Jones, Richard Speck, and a wide assortment of punks who find guns useful for relieving gas stations and convenience stores and citizens of their assets.

Springfield Newspapers, Inc., a corporation which publishes the Springfield Daily News, and several employees of that newspaper,[3] based on the Springfield Daily News' reprinting of the foregoing editorial under the title "NRA Power."

According to the Complaint, the NRA is a non-profit New York corporation, "dedicated to protecting and defending the inalienable right of the people to keep and bear arms as set forth in the Second Amendment to the United States Constitution."[4] The NRA, which as of May 13, 1980, had approximately 1,794,304 members,[5] publishes three magazines, *The American Rifleman, The American Hunter,* and *The American Marksman,* which as of December 9, 1980, had a combined total circulation of approximately 1,954,000.[6] With regard to the issue of gun control, the NRA has opposed the individual registration of firearms, and has objected to any law which would require individuals to register firearms.[7] The editorial which is the subject of the present lawsuit is, in general, a derisive comment on the NRA's opposition to, and the subsequent withdrawal of former President Carter's nomination of Norval Morris for the position of Administrator of the Law Enforcement Assistance Administration (LEAA). The editorial is sarcastic in tone and is sharply critical of the NRA's stance on the appointment of Morris, who advocated more stringent gun control and the decriminalization of certain "victimless" crimes.

> Mr. Morris also upset the NRA and its conservative friends in the Senate by advocating lifting criminal penalties from "victimless crimes," such as drunkenness, prostitution and some sex acts. This would free the police and courts to concentrate on more serious crimes, such as the murders and robberies the NRA so happily encourages.
>
> But the Carter administration knows when it is outgunned. It has dropped the nomination. So the Republic is safe, the right to bear arms safeguarded, the police still busting drunks and hookers. And the NRA folks can go back to selling guns and crying over the victims.
> Huzzah.

**3.** The individual defendants who are employees of Springfield Newspapers, Inc., are: John

Based on the publication of this editorial, the NRA initiated the present action, alleging in Count I of the Complaint that the Defendant Dayton Newspapers, Inc., and its employees had printed certain false statements of fact with knowledge of their falsity and in reckless disregard of their falsity. Specifically, the following "facts" are alleged to be untrue:

> Said editorial stated as fact that Plaintiff, National Rifle Association, happily encourages murders and robberies....
>
> ....
>
> Said editorial intended to convey as fact that the National Rifle Association, to sell guns and acquire financing from the manufacturers of guns, happily encourages murders and robberies: by promoting the sale of guns to known criminals and assassins, such as Lee Harvey Oswald, the Reverend Jim Jones and Richard Speck; by promoting the sale of guns to assorted punks for use in robbing gas stations, convenience stores and individual citizens of their assets; and by acting to prevent the police and courts from concentrating on these crimes; while continuing to sell guns and express false sorrow for the victims of the crimes it encourages.

Complaint, Doc. # 1, ¶s 16 and 18. The Second Count of the Complaint repeats the above allegations in connection with the purported liability of Springfield Newspapers, Inc., and its employees for the verbatim republication of the NRA editorial in

Black, President of Springfield Newspapers, Inc.; Richard Hibbet, Executive Vice-President of Springfield Newspapers, Inc.; William Swaim, Executive Editor of Springfield Newspapers, Inc.; and Loren Schultz, Editorial Director for the Springfield Daily News.

**4.** U.S. Const.amend II provides that "[a] well regulated Militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

**5.** *See,* Binswanger deposition, p. 44.

**6.** *See,* Binswanger deposition, p. 44.

**7.** *See,* Carter deposition, pp. 44–45. *See also,* Knox deposition, p. 69.

the Springfield Daily News on January 6, 1979.[8]  In addition, the Complaint invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1332(a)(1), based on the diverse citizenship of the Plaintiff and all Defendants.

The Defendants filed an Answer to the Complaint on January 23, 1980, and subsequently, on January 30, 1981, filed the motion for summary judgment which is presently under consideration.  Defendants have submitted an extensive memorandum in support of their summary judgment motion, and have attached thereto various affidavits and exhibits.  *See,* Doc. # 10 and Ex. A–H.  On March 11, 1981, Plaintiff filed a memorandum in opposition to the Defendants' motion for summary judgment, and included therewith the affidavits of four officers employed by the NRA.  *See,* Doc. # 14, Ex. 1–4.  Finally, on March 23, 1981, Defendants submitted a reply memorandum responding to those points raised by Plaintiff's memorandum, and the Court then took the matter under advisement.  It should be noted that in ruling upon the Defendants' motion, the Court has considered not only the materials referred to above, but has also examined the depositions of various employees of the Plaintiff and the Defendants, all of which have been properly filed herein as directed by Fed.R. Civ.P. 30(f).[9]

Defendants predicate their request for summary judgment upon two grounds. First, Defendants contend that Plaintiff cannot, based on the undisputed facts disclosed herein, meet the exacting requirements of proof established by *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710,

11 L.Ed.2d 686 (1964) (*New York Times*) and its progeny, that is, of demonstrating that the statements in question were made with " 'actual malice.' "  *Id.* at 280, 84 S.Ct. at 726.  As a second and independent basis for summary judgment, Defendants claim that the editorial involved in this case was absolutely privileged as an expression of pure opinion.

In response to the arguments advanced by Defendants, Plaintiff contends initially that while the NRA editorial is phrased as an opinion, it contains allegations and inferences of fact which are false, and which, therefore, are not entitled to protection. Plaintiff next suggests that summary judgment is particularly inappropriate in libel actions where matters pertaining to the defendant's state of mind are placed in issue. As a final matter, Plaintiff sets forth various "facts," primarily those contained in the editorial itself, which allegedly justify permitting this case to proceed to trial on the question of actual malice.

In answer to the points presented by Plaintiff, the Defendants claim, "without conceding that there are any facts—disclosed, undisclosed, or otherwise—expressed or inherent in the editorial opinion," Doc. # 17 at 6, that:

> Only one fact need be assumed in the present instance in order to preclude any interpretation of the editorial opinion as defamatory—that "fact" is that the NRA is an active and vocal opponent of gun control legislation at every level of government.

*Id.*  Based on this assumed, notorious, and non-defamatory fact regarding the NRA's

---

8. The editorial published in the Springfield Daily News was identical to the Dayton Daily News editorial, with the exception of the headline.  Rather than using the headline "NRA again murders good sense," the Springfield editorial was entitled "NRA Power."

9. Specifically, the Court has considered the depositions of the following NRA officers or employees: Warren Cheek, the Secretary of NRA; Harlon Carter, the Executive Vice President of the NRA; C. Neal Knox, the Executive Director of the NRA Institute for Legislative Action; George Martin, the Executive Director

of Publications for the NRA; John Layton, the President of the NRA at the time of his deposition; Gary Anderson, the Executive Director of General Operations for the NRA; and William Binswanger, the Treasurer of the NRA.  In addition, the Court has considered the depositions of various employees of the Defendant Newspapers, including Charles Riesz, Albert (Hap) Cawood, Arnold Rosenfeld, Thomas Teepen, Joseph Fenley, Loren Schultz, Richard Hibbet, and William Swaim, all of whom have been previously identified in footnotes 1 and 3, *supra.*

position on gun control, Defendants maintain that the editorial, while rhetorical and fraught with hyperbole, is nonetheless entitled to absolute constitutional protection. As a further matter, and in conclusion, Defendants contend that summary judgment still remains a triable and appropriate means of resolving libel actions in which, as here, no evidence of actual malice has been presented.

Each of the arguments advanced by the parties will be addressed in greater detail below. However, based on the undisputed facts presented herein, and the applicable legal authority, the Court has concluded that the Defendants' motion for summary judgment is well-taken, and must be granted.

## II. Discussion

### A. Applicable Summary Judgment Standard

As was previously noted, Plaintiffs contend, based on the Supreme Court decision in *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (*Hutchinson*), that summary judgment in libel actions may be entirely inappropriate, and that resolution of issues related to a defendant's state of mind should be left to the jury. In *Hutchinson,* the Supreme Court did not directly address the propriety of granting summary judgment in libel actions, because that issue was not before the Court. The facts recounted by the Supreme Court indicate that in April, 1979, Senator Proxmire awarded a "Golden Fleece of the Month Award" to several government agencies which had given Hutchinson approximately $500,000 over a period of seven years to investigate, *inter*

*alia,* "an objective measure of aggression, concentrating upon the behavior patterns of certain animals, such as the clenching of jaws when they were exposed to various aggravating stressful stimuli." *Id.* at 115, 99 S.Ct. at 2678. Based on the publication of certain remarks by Proxmire in the Congressional Record, in a press release and in a newsletter,[10] which inferred that Hutchinson had "made a monkey out of the American taxpayer," *id.* at 116, 99 S.Ct. at 2678, Hutchinson initiated an action for defamation against Proxmire and his legislative assistant. The district court granted summary judgment for the defendants, finding that some of the publications were absolutely immune under the Speech or Debate Clause, and that the remaining claims were not actionable because there had been no demonstration of actual malice. *See, id.,* at 118–120, 99 S.Ct. at 2679–81. The Court of Appeals affirmed. Although the Supreme Court reversed the judgment, it did so based on the fact that the lower courts had erred both in holding the transmittal of Proxmire's press release and newsletter absolutely immune, and, in finding that Hutchinson was a public figure for the purpose of applying the *New York Times* standard of actual malice. *See, id.* at 132–136, 99 S.Ct. at 2686–89.[11] The Court thus did not specifically reach any issue relating to the propriety of utilizing summary judgment in libel actions.

The Supreme Court did, however, in passing, note the District Court's comment to the effect that "in determining whether a plaintiff had made an adequate showing of 'actual malice,' summary judgment might well be the rule rather than the exception." *Id.* at 120, 99 S.Ct. at 2680.[12] The Supreme Court then observed that:

> the Court of Appeals' opinion that it would not affirm the district court's state-law holding. *See, id.* at 123, 99 S.Ct. at 2682.

---

**10.** Proxmire also appeared on television but apparently did not refer to Hutchinson by name. *See, id.* at 117, 99 S.Ct. at 2679.

**11.** In addition, the Court noted that the Appellate Court had not ruled on one aspect of the case, i.e., the District Court's determination that even if Hutchinson were not considered a public figure, summary judgment would be appropriate based on the applicable state law. *See, id.* at 120, 122, 99 S.Ct. at 2680, 2681. The Court observed that there were indications in

**12.** The justification advanced for such a "rule" has been that "[t]he threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself." *Washington Post*

Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question ..., and does not readily lend itself to summary disposition.... In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

*Id.* at n. 9.

■ Following the *Hutchinson* decision, the Sixth Circuit adopted the Second Circuit's position, based on its interpretation of *Hutchinson,* that "there is no rule which favors either granting or denying motions for summary judgment in defamation cases." *Schultz v. Newsweek, Inc.,* 668 F.2d 911, 917 (6th Cir.1982), following *Yiamouyiannis v. Consumers Union,* 619 F.2d 932 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980) (*Yiamouyiannis* ). Thus, contrary to Plaintiff's contention, summary judgment is not precluded, or even disfavored merely because the state of mind of the Defendants has been placed in question.

■ While the Sixth Circuit did not set forth a particular standard to be utilized in evaluating motions for summary judgments in libel actions, *see,* 668 F.2d at 917, the Court in *Yiamouyiannis* fashioned the following rule, which encompasses both the general Rule 56 criteria and the unique standard of proof applied in defamation actions:

> In a case where the defendant has moved for summary judgment on the issue of actual malice and the plaintiff claims that there remain material factual disputes, the court decides the materiality of the disputed facts by accepting the plaintiff's version and applying the actual malice standard. This standard requires a clear and convincing showing, which may be by circumstantial evidence, of defendant's actual state of mind—either subjective awareness of probable falsity

or actual intent to publish falsely. Therefore, a judge in denying a defendant's summary judgment motion must conclude that, based on the evidence asserted in the plaintiff's affidavits, "a reasonable jury *could find* malice with convincing clarity."

619 F.2d at 940 (citations omitted) (emphasis in original).

Because the Sixth Circuit agreed with the summary judgment approach taken in *Yiamouyiannis,* and because the above standard appears to correctly combine the dictates of Rule 56 with those characteristics peculiar to libel actions, this Court concludes that it may appropriately apply the foregoing summary judgment criteria in ruling upon the outstanding motion for summary judgment. Having found no automatic bar which would preclude the issuance of summary judgment herein, the Court now turns to consideration of whether, under the circumstances of the present case, and under the application of the criteria outlined in *Yiamouyiannis* and other pertinent authority, summary judgment may appropriately be granted to Defendants.

**B. *Protection of Editorial As a Statement of Opinion***

In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (*Gertz* ), the Supreme Court stated that:

> Under the First Amendment there is no such thing as a false idea [opinion]. However pernicious an opinion may seem, we depend for its correction not upon the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–340, 94 S.Ct. at 3006 (footnote omitted). As was previously indicated, Defendants contend that the editorial published in the Dayton Daily News and reprinted in the Springfield Daily News is not action-

Co. v. Keogh, 365 F.2d 965, 968 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17

L.Ed.2d 548 (1967).

able because the statements contained therein were purely opinion, or if factual, were not based on undisclosed defamatory facts.

The Sixth Circuit observed in *Orr v. Angus-Press Co.*, 586 F.2d 1108 (6th Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (*Orr*) that based on *Gertz*, "[i]t is now established as a matter of constitutional law that a statement of opinion about matters which are publicly known is not defamatory." *Id.* at 1114. In determining whether the statements in *Orr* were protected as statements of opinion, the Sixth Circuit utilized the formulation of the *Gertz* principle contained in the Restatement (Second) of Torts § 566 (1977):

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

. . . .

It is the function of the court to determine whether the expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct.

*Id.*

The Restatement itself distinguishes between pure opinion and opinion based on fact. With respect to pure opinion, the Restatement indicates that:

The simple expression, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. . . . The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated.

*The pure type of expression of opinion may also occur when the maker of the comment does not himself express the alleged facts on which he bases the expression of opinion. This happens when both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment. The assumption of the facts may come about* because someone else has stated them or *because they were assumed by both parties because of their notoriety* or otherwise.

Restatement (Second) of Torts § 566 comment b (1977) (emphasis added).

In the present case, the notorious, assumed facts upon which the editorial is predicated are those suggested by Defendants, *i.e.*, that the NRA is opposed to registration of firearms and gun control, and has lobbied extensively in support of its position at various levels of state and federal government. The undisputed facts herein indicate that the NRA itself concedes that its position on gun control is "common knowledge." Knox deposition, p. 69. Harlon Carter, present Executive Vice-President of the NRA and former Executive Director of the NRA Institute for Legislative Action (ILA), stated with regard to the NRA position on gun control that:

Q: But the NRA opposes any individual registration of firearms.

A: We do.

Q: So forgetting what the person may do with the firearm . . ., if I as an individual go into a firearms dealer I should be able to buy the firearms from him as long as I have the money?

A: You should first comply with the laws which prevail in that city or in that place and we advocate compliance with the law even though we object to the law.

Q: *Well then, you're objecting to any law which would require me or any other individual to register individually the firearm.*

A: *Yes, we do.*

Carter deposition, pp. 44–45.

In order to further concentrate on political issues, the NRA established the Insti-

# 1306

tute for Legislative Action (ILA), for the purpose of influencing legislation on the issue of gun control. *See, id.* at 5 and 14.[13] The ILA is responsible for representing the NRA before legislative groups, and contains several divisions, including a federal division, a state and local division, an administrative division, a communications division and a legal division. *See, id.* at 9–10. Carter indicated that the communications division "consists of a group of people who are writers and publications types and they are busily engaged in that field." *Id.* at 10. Specifically, Carter stated that:

> They write various studies, they write reports, they write news items, they write articles for publication, they write speeches, they write various things that there is a requirement for writing in order to get the truth over to the American people about what constitutes crime control and what constitutes gun control.

*Id.*

In addition to commenting on the above matters, Carter detailed various appearances he had made before legislative groups, *see, id.* at 6–7, and noted that the ILA engaged in political lobbying, both through employees who were registered as lobbyists, and through an outside lobbying group, Timms & Co., which represented the NRA. *See, id.* at 20–21. In Carter's opinion, the ILA, as of the time of his deposition, was performing "a good job" of influencing legislation on the gun control issue. *Id.* at 14. Further, C. Neil Knox, the executive director of the ILA, and chairman of the NRA Political Victory Fund, indicated that key races of political candidates who were opposed to gun control were selected, and those candidates were supported, within the limits of the federal election laws, by contributions, and by other actions, including, *inter alia,* the placement of ads in newspapers and on radio. Knox deposition, pp. 4, and 95–97.

Based on the preceding discussion of undisputed facts, it is apparent that the NRA

espouses an acknowledged and well-known position on gun control, and actively advocates its views in various arenas of legislative and political activity. Placed in this context of notorious facts, the Dayton Daily News editorial is nothing more than an expression of opinion regarding the NRA's not surprising opposition to a political appointee who favored increased controls on weapons. While the editorial is taunting in tone and is permeated with sarcasm and colorful expressions, "the newspaper's 'opinion' about ... [the NRA's opposition to Norval Morris and the effect of the continued availability of guns] cannot be made the basis of a libel suit against the newspaper." *Orr,* 586 F.2d at 1115.

The NRA concedes that pure opinion is protected, but asserts that the editorial contains false statements of fact rather than opinion regarding the fact that the NRA is financed by manufacturers of firearms; the "fact" that the NRA happily encourages murders and robberies; the "fact" that the NRA sells guns; and the "reasonable factual inference" to be derived from the editorial, i.e., that the NRA promotes the violation of firearms laws by encouraging the sale of firearms to convicted felons such as Lee Harvey Oswald and Jim Jones. *See,* Doc. # 14, pp. 5–8. Initially, it should be noted that the NRA interpretation of several of the editorial comments is an erroneous construction of the actual statements which were made. Moreover, it is apparent from reading the editorial that most of the statements to which objection has been made are expressions of opinion, and that to the extent factual predicates for the statements can be ascertained, they are either true, or if based on undisclosed facts, are not defamatory.

■ First, with respect to the financing of the NRA, the editorial states that "the NRA ... is financed by the manufacturers of firearms and by shooters." *See,* footnote 2, *supra.* Plaintiff maintains that the NRA is not financed by firearms manufacturers,

---

**13.** It is undisputed that the Institute for Legislative Action was established by the NRA and is financed by NRA revenues. *See,* Carter deposition, p. 5 and Binswanger deposition, pp. 15–17.

and that the preceding statement is defamatory because it suggests that "the manufacturers of firearms provide secret financing to the NRA." Doc. # 14, p. 10, n. 1. However, contrary to Plaintiff's contentions, the NRA, in fact, is financed by firearms manufacturers, and thus, the factual predicate for this statement is true. In addition, there is plainly absent from the editorial any inference to the effect that the financing given to the NRA by manufacturers is either secret or illegal.

Webster's Third New International Dictionary 851 (1976) defines finance as follows: "to raise or provide funds or capitol for." Based on the undisputed facts disclosed herein, it is apparent that firearms manufacturers *do* directly provide funds or capitol for the NRA, by purchasing advertising in NRA publications, and by paying fees to rent exhibit space at NRA conventions. William Binswanger, the NRA treasurer, indicated that the income of the NRA is derived from the following major sources: membership dues,[14] dividends and interest; sales of training materials and booklets; yearly fees paid by clubs affiliated with the NRA; contributions to the ILA; and advertising placed in the three NRA publications, i.e., *The American Rifleman, The American Hunter,* and *The American Marksman. See,* Binswanger deposition, pp. 5, 9, 11, 12, and 13. The revenues obtained from these sources are placed together in a fund, from which the publication of the NRA magazines is financed. *See, id.* at 18. The advertising revenues generated in any particular year from advertisements paid for by firearms manufacturers account on an average, for approximately 30.7% of gross advertising income. Binswanger affidavit, attached as Ex. 2 to Doc. # 14.[15]

**14.** Although Binswanger noted that the primary NRA revenues were obtained from membership dues, *see, id.* at 9, this fact is entirely consistent with the editorial, which indicated that the NRA was financed by "manufacturers of firearms *and by . . . shooters*" (emphasis added). There is no dispute herein regarding the fact that "shooters" is a term used by the NRA to describe its members. *See,* Knox deposition, p. 55.

**15.** The figures submitted in the Binswanger affidavit indicate that from 1970–1978, advertising income from firearms manufacturers accounted for the following approximate percentages of total gross advertising income: 1970, 29.4%; 1971, 34.5%; 1972, 30.8%; 1973, 32.2%; 1974, 31.3%; 1975, 31.2%; 1976, 30.9%; 1977, 30%; and 1978, 26.7%. *See,* Ex. 2 attached to Doc. # 14, ¶ 2. In addition, George Martin, the Executive Director of Publications for the NRA, stated that the 1970 advertising revenues from *gun* manufacturers only, and for *The American Rifleman* only, amounted to approximately one-third of the advertising income received by the NRA during 1979. Martin deposition, at 3, and 17–21. Because this latter information appears to conflict with that contained in the Binswanger affidavit, a few comments are in order.

First, given the discrepancy between the 1979 figures reported by Martin, and those found in the Binswanger affidavit, there is some question in the Court's mind regarding whether the Binswanger affidavit reflects an accurate account of advertising income from *all* NRA publications, or whether only income received from firearms manufacturers' advertising in *The American Rifleman* has been included. Specifically, it is somewhat difficult to understand why 1979 income from only one magazine would surpass the percentage of total advertising revenue ostensibly attained by three publications the preceding year. This inconsistency is particularly heightened by the fact that the reputed circulation figures for *The American Rifleman* are not substantially in excess of those reported for *The American Hunter. See,* Martin deposition, at 21 (indicating that circulation guarantees used in connection with the sale of advertising in NRA publications were 1,175,000 for *The American Rifleman* and 775,000 for *The American Hunter*). It is, of course, conceivable that Martin's computations were inaccurate. This factual dispute is not deemed by the Court to be material, however, because even if the income figures in the Binswanger affidavit are accepted as a reflection of revenue from firearms manufacturers' advertising in all three magazines, that is, if all factual inferences are construed in Plaintiff's favor, *see,* Fed.R.Civ.P. 56(e), the only conclusion which may be drawn is that the NRA is, in fact, financed, at least in part, by the manufacturers of firearms.

It is also interesting to note that advertising revenues from manufacturers of ammunition and other products used in connection with firearms were not included in the NRA computation of gross advertising income. *See,* Ex. 2 attached to Doc. # 14, ¶ 2 (reflecting income only from firearms manufacturers) and Martin deposition at 19 (indicating that no studies of ammunition revenues had been made). While it is true that the Dayton Daily News editorial specified firearms manufacturers, ammunition

The NRA basically offers two types of memberships, annual and lifetime. Annual memberships may be purchased in one, three or five year terms, and with the purchase of an annual membership, a member is entitled to receive either *The American Rifleman* magazine or *The American Hunter* magazine at no additional cost. Binswanger deposition, at 10. *See also,* Martin deposition, pp. 8–9. The publication of at least *The American Rifleman* is required under the bylaws of the NRA, and to the extent that advertising revenue from firearms manufacturers could not be obtained, the NRA would be obliged to acquire funds from other sources, "internal as well as external." Martin deposition, at 28–29.

In addition to advertising income, the NRA receives revenue from firearms manufacturers in the form of fees paid for the rental of exhibit space at the annual NRA conventions. Warren Cheek, the Secretary of the NRA, indicated that official meetings of the members are required by the NRA bylaws, and that exhibitors were originally sought in order to attract NRA members to these meetings. Cheek deposition, pp. 3 and 33. Immediately following each NRA annual convention, most exhibitors reserve space for the next year's convention, but do not receive contracts, or applications for booth space until December of that year. *See, id.* at 34–35.[16] On the application form used in connection with the 1978 convention, the rental fee for exhibitors is listed as $300.00 for an inside booth, and $325.00 for a corner booth. *See, id.* at 37,

and Cheek deposition, Ex. 2. Cheek indicated specifically that Colt Firearms Division had applied for and made payment for booth space in 1978, and that Springfield Armory, a commercial firm which made firearms, applied for booth space in 1979 and 1980. Cheek deposition, at 37, 58 and 59–60. *See also,* Cheek deposition, Ex. 2 and Ex. 7.[17] As a final matter, Cheek indicated that the exhibit fees charged by the NRA were used to defray the expenses of the annual convention, and were administered through the accounting office of the NRA. Cheek deposition, at 68.

Based on the preceding facts, which have not been disputed, the Court finds that the NRA was in fact financed, at least in part, by firearms manufacturers, and that, accordingly, the statement in the Dayton Daily News editorial cannot be considered a false statement of fact.

In two of the affidavits submitted by the NRA, the affiants state that they understood the editorials in the Dayton Daily News and the Springfield Daily News as having "accused the National Rifle Association of encouraging the violation of laws regarding murder and robbery." *See,* Doc. # 14, Ex. 1, ¶ 4, and Ex. 2, ¶ 5. *See also,* Knox deposition, p. 52. Specifically, the following exchange occurred during Knox's deposition:

Q: When you read that, you read that as a fact, that the NRA actually factually happily encourages murders and robberies?

---

and firearms would appear to be intimately related items. However, the Court's decision has not been predicated in any part upon such a connection, since there is no indication in the record of what, if any, NRA revenues are derived from the sale of advertising to ammunition manufacturers.

16. Ex. 2 and Ex. 7 attached to the Cheek deposition list the anticipated dates for the 1978 and 1979 NRA conventions as April 14–16 and May 18–20, respectively. Thus, it would appear that contracts for the April, 1978 convention would have been sent to exhibitors in December, 1977.

17. Based on Cheek's testimony, which is not contradicted by any evidence of record, there can be no doubt about the fact that the NRA

does receive annual convention income from manufacturers of firearms. Specifically, the Court notes the following exchange regarding the exhibits at the NRA annual convention:

Q: Are these exhibits or are the exhibitors limited to manufacturers of firearms for sporting and hunting?
A: We try very hard, yes, to limit it to the sporting type of firearms....
....
Q: You certainly have handguns exhibited there, do you not?
A: Oh, yes.

Cheek deposition, at 43–44. *See also,* Martin deposition, at 53, and Binswanger deposition, at 33.

A: That's what it states.

*Id.* According to the Complaint, the acts allegedly performed by the NRA to in fact encourage murders and robberies are the promotion of the sale of guns to known assassins and assorted punks, and other unidentified actions taken by the NRA to prevent the police and courts from concentrating on the crimes committed by known assassins and punks. *See,* Complaint, Doc. # 1, ¶ 18.

Despite the NRA's interpretation of the phrase, "the murders and robberies the NRA so happily encourages," it is frankly "impossible to believe that a reader ... would not have understood exactly what was meant," *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970), that is, "even the most careless reader must have perceived that the ... [phrase] was no more than rhetorical hyperbole, a vigorous epithet used by those who considered ... [the NRA's] position extremely unreasonable." *Id.* (parenthetical material supplied).[18]

In a case similar to the present, Neil Johnston, a former professional basketball player, sued *Sports Illustrated,* claiming that he had been libeled in an article published about Bill Russell, who had been selected by Sports Illustrated as the "Sportsman of the Year." *Time, Inc. v. Johnston,* 448 F.2d 378, 379 (4th Cir.1971). In particular, Johnston objected to, *inter alia,* the following comments: "[y]ou take Neil Johnston—..., Russell *destroyed* him. He *destroyed him psychologically as well,* so that he practically ran him out of organized basketball." *Id.* (emphasis added). Although the District Court denied motions for summary judgment which had been filed by both parties, the Court of Appeals reversed

the denial of the defendant's motion for summary judgment, dismissed Johnston's cross-appeal, and ordered the District Court to enter judgment for the defendant. *See, id.* at 379, 385. In finding for the defendant, the Court of Appeals rejected Johnston's assertion that the words "destroyed" and "psychologically destroyed" were defamatory, stating that:

> *Manifestly, the challenged words were not used literally. No one reading the article would have assumed that Auerbach was stating that the plaintiff was actually and literally "destroyed,"* during the game being discussed. Auerbach was attempting to identify Russell's emergence as a star basketball player; he did that by recounting an event which, as he saw it, marked the beginning of Russell, the star, and incidentally, the eclipse of the plaintiff as star.

*Id.* at 384. (emphasis added). The Court then stated:

> In describing the event, *he used phrases of some vividness, used them in a figurative, not literal sense,* used a form of hyperbole typical in sports parlance. *New York Times* does not interdict legitimate or normal hyperbole.... *To deny to the press the right to use hyperbole, under the threat of removing the protecting mantle of New York Times, would condemn the press to an arid, desiccated recital of bare facts.*

*Id.* (emphasis added) (citation omitted).

As with the use of the word "destroyed" in *Times, Inc. v. Johnston,* the employment of the phrase "the murders and robberies the NRA so happily encourages," represents nothing more than a resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction.[19]

---

**18.** Hyperbole is defined as "extravagant exaggeration that represents something as much greater or less, better or worse, or more intense than it really is or that depicts the impossible as actual." Webster's Third New International Dictionary, 1112 (1976).

**19.** In fact, the editorial comments at issue in the present case could be considered restrained in comparison to the stinging rebukes and in-

vective which have been hurled but have not been found to be actionable. For example, in *Loeb v. Globe Newspaper Co.,* 489 F.Supp. 481 (D.Mass.1980), the Court found the following statements about Loeb, and his newspaper, the *Union Leader,* privileged as editorial opinions: "the *Union Leader* is 'probably the worst newspaper in America' ... he 'edits his paper like a 19th Century yellow journal' ..., his views are 'venomous' and ... his newspaper is a 'daily

The tone of the editorial, in fact, is first established by the headline "NRA again murders good sense." [20] This initial use of the word murder is obviously not intended literally, but is meant to suggest that the NRA has adopted a position or taken some action which is absurd, or lacking in sense, at least in the opinion of the editorial writer. The ironic, sarcastic tone of the editorial is further established and maintained throughout by the use of slang and phrases such as: "[t]he National Rifle Association has bagged another one;" [21] "that hotbed of crazed radicalism, the very establishment University of Chicago;" "folding green;" "punks who find guns useful for relieving gas stations . . . of their assets;" "the Carter administration knows when it is outgunned;" and "the police still busting drunks and hookers." Moreover, given the NRA's notorious opposition to gun control, as well as the comments in the editorial which specifically advance the opinion that more stringent gun control laws would decrease the number of murders and robberies,[22] the only logically susceptible interpretation of the phrase "murders and robberies the NRA so happily encourages," is that by opposing gun control, and in this instance particularly, by impeding the appointment of a gun control advocate to an influential law enforcement position, the NRA has participated in effectively permitting the continuation of violent crime in this society. It is frankly immaterial whether the editorial writer is correct in contending either that the failure to control the availability of weapons increases violent crime, or that the NRA's opposition to gun control contributes to the atmosphere in which such crime flourishes; these assertions are plainly nothing more than opinions, and the inferences which have been culled therefrom by Plaintiff are so " 'strained, unreasonable and unjustified,' " *Loeb v. New Times Communication Group*, 497 F.Supp. 85, 90 (S.D.N.Y.1980) (citations omitted), that they cannot be credited.

Specifically, the Court rejects the inferences in ¶ 18 of the Complaint to the effect that the editorial conveys or intends to convey *as fact* that the NRA encourages murders and robberies by promoting the sale of guns to known criminals, assassins, and assorted punks, and by obstructing the efforts of the courts and the police. To begin, the editorial does not state that the NRA has advocated the sale of guns to these groups of people. The editorial states, instead, that:

drip of venom.' " *Id.* at 483. The Court also determined that the opinion privilege applied to a cartoon in which Loeb was "depicted with a cuckoo springing from his forehead." *Id.* Moreover, because the Court concluded that it would be impossible for readers to take as assertions of fact comments to the effect that the publisher of the *Union Leader* " 'runs a newspaper by paranoids for paranoids' . . ., [and that Loeb] 'never backed a presidential winner,' " it ruled as a matter of law that "these statements do not contain such factual assertions as will permit an action for defamation against a public figure." *Id.* at 486 (parenthetical material added) (citations omitted). *See also, Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976) (finding non-actionable as opinion the statement that William Buckley was a "fellow traveler of fascism," *id.* at 890, in view of the "debatable, loose and varying" content of the terms "fascism" and "fellow traveler." *Id.* at 894).

20. As was previously noted, the Springfield Daily News editorial bore a different headline than did the editorial published in the Dayton Daily News. *See,* footnote 8, *supra.* For analytical purposes, however, this fact is irrelevant, since the tone of the editorial is set not only by the headline, but also by the content of the editorial itself.

21. The use of the word "bagged," for example, is clearly nonliteral. According to Webster's Third New International Dictionary, 162 (1976), one definition of "bag" is "to take (animals) as game: to kill or capture game." Based on the NRA's recognized association with the sport of hunting, it is apparent that the editorial writer is employing this metaphor to describe in an exaggerated, and, thus, heightened fashion the role which the NRA played in the withdrawal of Norval Morris' nomination by the Carter administration. Under no conceivable interpretation, however, could the editorial be viewed as inferring that the NRA *in fact* killed or captured anything.

22. *See,* paragraphs four, five, and six of the editorials, which express in unambiguous terms the opinion that the kind of access to weapons permitted in our society enhances the proliferation of crime, and in particular, murder.

[Morris] is opposed to the kind of free availability of guns that virtually every other country in the world considers insane.

This makes him dangerous to the NRA, which is financed by the manufacturers of firearms and by the shooters who have been propagandized into zealous defenders of the companies' right to sell guns to just about anybody who has the folding green. People like Lee Harvey Oswald, the Rev. Jim Jones, Richard Speck, and a wide assortment of punks who find guns useful for relieving gas stations and convenience stores and citizens of their assets.

*Id.* at footnote 2, *supra.*

Initially, it should be noted that the NRA is not identified in the editorial as the party who propagandizes the shooters. However, assuming *arguendo* that the NRA is the party responsible for "propagandizing,"[23] it is flatly inconceivable that a reader would assume, upon reading the above, that the NRA literally, and, in fact, urges the sale of lethal weapons to known mass murderers, to convicted felons, or to persons intent upon committing crimes. No such suggestion is made, and no such inference may rationally be gleaned from the language used in the editorial. Rather, the simple, unambiguous point being made is that without increased restrictions on the availability of weapons, guns may be purchased by almost *anyone with the financial ability to do so*, including persons who are dangerous to society. Purely as *examples* of types of persons who are dangerous to society, the editorial lists Lee Harvey Oswald, the Reverend Jim Jones, and Richard Speck, notorious assassins or mass murderers. To say that the editorial implies that the NRA *wishes arms to be sold to these individuals* borders on the absurd, and would require a deviation from the express, plainly articulated meaning of the editorial.[24]

As was previously indicated, the NRA alleges in ¶ 18 of the Complaint that the editorial "intended to convey as fact that the National Rifle Association ..., happily encourages murders and robberies: ... by acting to prevent the police and courts from concentrating on these crimes." Doc. # 1, ¶ 18. Again, the editorial is capable of no such construction. Specifically, the editorial states that:

> Mr. Morris also upset the NRA and its conservative friends in the Senate by ad-

**23.** While propaganda can be interpreted, perhaps, in a pejorative manner, it is in fact, defined as the "dissemination of ideas, information or rumor for the purpose of helping or injuring an institution, a cause, or a person," or as "doctrines, ideas, arguments, facts, or allegations spread by deliberate effort through any medium of communication in order to further one's cause." Webster's Third New International Dictionary, 1817 (1976). *Under these definitions, the NRA has indicated that it does seek to disseminate information, or propagandize its views.* Thus, during the deposition of Harlon Carter, the following exchange occurred regarding the NRA Institute for Legislative Action:

> Q: [The ILA] has as its purpose to influence legislation on the gun control issue?
> A: To the extent possible, yes.
> Q: Wouldn't you characterize the "extent possible" as pretty successful thus far?
> A: Not as successful as I would desire, but I think they're doing a pretty good job.
> Q: What would you desire the Institute for Legislative Action to do to be successful? ...
> A: *To convince the American people as to the truth where crime lies and its causes and to persuade the people to stay out of periph-*

> *eral discussions which are designed to distract them from the real causes of crime,* which, as you know, are social and political and educational and family and religious, and what have you. That's where crime lies.
> Q: You have mentioned a couple of times the real truth with regard to the gun control issue.
> A: I have just explained what I mean by the real truth.

Carter deposition, p. 14 (emphasis added).

**24.** Interpreting the editorial in the manner advanced by Plaintiff would additionally require an act of divine intervention, at least with regard to the sale of arms to Oswald and Jones, since it is apparently undisputed that these individuals were not among the living at the time of the publications in question. Moreover, the conclusion that these nefarious murderers were listed solely as examples of persons who committed violent crimes rather than as persons to whom the NRA advocates selling guns is underscored by the fact that Speck's particular crimes were committed with a knife rather than with a gun. *See,* Carter deposition, p. 55.

vocating lifting criminal penalties from "victimless crimes," such as drunkenness, prostitution, and some sex acts. *This would free the police and courts to concentrate on more serious crimes,* such as the murders and robberies the NRA so happily encourages.

*Id.* at footnote 2, *supra.* (emphasis added).

As was noted earlier, one opinion voiced in the editorial is that the absence of strict gun control legislation causes violent crime to proliferate, and that to the extent the NRA successfully impedes either the adoption of such legislation or the appointment of gun control advocates to influential law enforcement positions, the NRA in effect, "happily encourages" murders and robberies. A further opinion in the editorial, shared with Norval Morris, is that decriminalization of certain "victimless" crimes would allow the police and the courts to attend more fully to serious crimes such as murder and robbery. To the extent that these "victimless" crimes are not decriminalized, it is, of course, axiomatic that law enforcement energy and court time will continue to be expended in connection with their resolution. These opinions are either directly expressed in the editorial, or follow logically from the statements in the editorial. What is not contained in the editorial, and what cannot be implied therefrom, is any inference that the NRA itself is literally obstructing the courts and the police in the performance of their duties. Moreover, even if the editorial did state that the NRA by opposing Morris' nomination somehow prevented certain crimes from being decriminalized, there is surely no defamatory construction which could be placed upon this type of activity, which would involve nothing more than the kind of participation in the political process traditionally sanctioned in our society. Consequently, the Court concludes that contrary to the assertions in ¶ 18 of the Complaint, the editorial does not convey, or intend to convey as *fact* that the NRA encourages murders and robberies by acting to prevent the police and courts from concentrating on these crimes.

The NRA additionally alleges that the editorial contains a false statement regarding the fact that the NRA sells guns. *See,* Doc. # 14, p. 7. Of the statements objected to by Plaintiff, this statement appears to be one which, under the Restatement standard, could arguably appear to be a "mixed" expression of opinion. Specifically, the editorial states that:

[T]he Carter administration knows when it is outgunned. It has dropped the nomination. So the Republic is safe, the right to bear arms safeguarded . . . . *And the NRA folks can go back to selling guns and crying over the victims.*

*Id.* at footnote 2, *supra* (emphasis added).

With regard to mixed expressions of opinion, the Restatement indicates that:

[T]he mixed type is one which, while an opinion in form or context, is *apparently based on facts regarding the plaintiff or his conduct* that have not been stated by defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant.

Restatement (Second) of Torts § 566 comment b (1977) (emphasis added). Thus, under the above theory, "[i]f the defendant expresses a derogatory opinion without disclosing the facts upon which it is based, he is subject to liability if the comment creates the reasonable inference that the opinion is justified by the existence of unexpressed defamatory facts." *Id.* at comment c(4).

In the present case, the operative portion of the Restatement definition is that emphasized above, i.e., "apparently based on facts regarding the plaintiff or his conduct." Contrary to Plaintiff's suggestion, it is obvious that the language in question does not refer to the conduct of the Plaintiff. The editorial comment does *not* state that the NRA sells guns; what it does plainly state is that NRA "folks" sell guns. This distinction between the NRA and NRA folks is particularly significant when viewed in the context of the remainder of the editorial, for in *all* other places therein

where reference is made to the association itself or to the conduct of the association, only the terms NRA or National Rifle Association are employed. *See, e.g.,* "[t]he National Rifle Association has bagged another one;" "dangerous to the NRA, which is financed;" "upset the NRA and its conservative friends in the Senate;" "murders and robberies the NRA so happily encourages." *Id.* at footnote 2, *supra.*

This distinction, although apparent in itself, is further revealed through the meaning of the term "folks," which is commonly defined as "the *masses of people in* a homogeneous social group." *Webster's Third New International Dictionary,* 882 (1976) (emphasis added). Thus, in the present situation, the "folks" referred to in the editorial are the *members or masses of people in* the homogeneous social group, or the NRA,

rather than the group itself. This being the case, comments either about persons other than the NRA, or about conduct other than that of the NRA cannot form the basis of the NRA's action for libel. Consequently, even if the editorial comment is false, and if false, capable of a defamatory construction, the NRA is not entitled to recovery based on the statement that "the NRA folks can go back to selling guns and crying over the victims." [25]

As a final matter, the NRA asserts that the editorial falsely sets forth as fact "[t]he reasonable factual inference, though undisclosed, that the NRA promotes the violation of firearms laws to obtain financing for its activities." Doc. # 13, p. 5. This contention can be disposed of with relative dispatch, for it is obvious, in view

---

25. It should be noted that while the evidence submitted on this point is somewhat scant, it is presently undisputed that at least one person on the NRA board of directors operates a gun store. *See,* Cheek deposition, p. 28. In addition, Cheek indicated that another board member *sold sporting goods, including* "shooter supplies." *Id.* Because directors of the Board must be lifetime NRA members, *see, id.* at 19, it is apparent that the statement to the effect that NRA folks sell guns is, in fact, true. At the very least, Plaintiff has submitted no evidence which would justify a conclusion to the contrary.

Another point of interest is that while the NRA itself *does not sell weapons, the* NRA was for many years directly benefited financially by a federal firearms sales program which required NRA membership as a prerequisite for participation. *See, Gavett v. Alexander,* 477 F.Supp. 1035, 1038–1039 (D.D.C.1979). Under this program, which remained in effect until well after the publication dates involved herein, citizens were eligible to purchase Army firearms at a substantial discount, *see, id.* at 1039, n. 5, only if, *inter alia,* they were current members of the NRA, *i.e.,* had paid the then annual dues of fifteen dollars. *See, id.* at 1039, 1047. In this context, the Court specifically observed that:

> The [plaintiff] NCBH claims that it is the principal political opponent on gun control legislation, and that the rifle sale program subsidizes the NRA on this regard, by giving it increased funds, [and] increased membership.... *According to NRA's reports, its membership increased during periods of increased rifle sales by the military.*

*Id.* at 1040, n. 12 (emphasis and parenthetical material added).

Assuming *arguendo* that the statement in the editorial could be read to imply that the NRA itself participated in selling weapons, it would be impossible to conclude either that this statement must be based on undisclosed facts which are defamatory, or that insofar as the statement itself could be considered factual, that it is defamatory in the sense of reflecting "upon the character of ... [the NRA] by bringing ... [it] into ridicule, hatred, or contempt or ... [by affecting it] injuriously in ... [its] trade or profession." *Cleveland Leader Printing Co. v. Nethersole,* 84 Ohio St. 118, 95 N.E. 735 (1911). *Accord, Becker v. Toulmin,* 165 Ohio St. 549, 138 N.E. 391 (1956). The reasons for these conclusions are threefold. First, there is no inherently derogatory inference or unsavory nuance to be found in the simple statement that a party, either private or corporate, engages in the sale of weapons. In fact, the United States Government itself dealt extensively in the sale of weapons to NRA members. *See,* 477 F.Supp. at 1039, n. 6 (indicating sales by the Army to NRA members of over 118,000 weapons in 1961). *Second, the NRA's own* intimate association with arms sales, publicly sanctioned by Congress pursuant to statute since 1924, and apparently acquiesced in by the NRA in order to increase its membership, *see, id.* at 1040, n. 12, is flatly inconsistent with the claim that a connection with the sale of weapons is incompatible with, and thereby injurious to the business of the NRA. Finally, there are no inferences in the editorial to the effect that the NRA or any other party has engaged in unethical or illegal conduct. Thus, even if the NRA itself had been linked to the sale of arms, that fact would not provide a predicate for concluding that the NRA had been defamed.

of the preceding discussion, that the editorial cannot be construed in the manner suggested by the Plaintiff. The only statements or inferences which Plaintiff maintains support the above factual conclusion, are those which allegedly indicate that Plaintiff "sold guns and promoted the sale of firearms to known criminals so it could maintain its financial security." *Id.* at 9. As has been previously indicated in the main text and in footnotes 23 and 24, the editorial neither states nor reasonably implies that the NRA advocates selling guns to known felons, that the NRA sells weapons, or that the NRA engages in such activities in order to receive financing. Consequently, given the absence of the statements and innuendo erroneously inserted into the editorial by Plaintiff, the "reasonable factual inference" said to follow therefrom cannot exist. Accordingly, the Court finds that Defendants cannot be held accountable for the alleged false factual implication that the NRA promotes the violation of firearms laws in order to obtain financing.

■ The foregoing discussion has indicated that the comments in the editorial published in the Dayton Daily News and reprinted in the Springfield Daily News are protected expressions of pure opinion under *Gertz, supra,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and that the false statements of "fact" objected to by Plaintiff are not factual statements, or to the extent they may be factually predicated, either are true, or are incapable of the interpretation advanced by Plaintiff. While these conclusions are dispositive of the present motion, the Court will additionally address the alternate ground presented by Defendant's

motion for summary judgment, that is, whether under the undisputed facts established herein, Plaintiff can demonstrate the existence of actual malice with convincing clarity.[26]

## C. *Actual Malice*

■ As was noted earlier, in the introductory portion of this Opinion, Defendants contend that there are no genuine issues of material fact with regard to whether the publications involved in this case were made with actual malice. Although the present action is predicated on diversity jurisdiction, thus rendering Ohio law applicable, the common law of defamation has in large part "been subsumed in and altered by constitutional holdings." *Orr, supra,* 586 F.2d 1108, 1114 (6th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).[27] Thus, in order to preserve the vitality and breadth of public debate traditionally insured by the First and Fourteenth Amendments, the Supreme Court in *New York Times, supra,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), held as follows:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.* at 279–280, 84 S.Ct. at 725. In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a majority of the Supreme Court justices concluded

---

**26.** Based on the foregoing analysis, the Court also finds, as a matter of law, that the editorial written about the Morris nomination is not reasonably capable of a defamatory interpretation. *See, Clark v. American Broadcasting Co.,* 684 F.2d 1208, 1213 (6th Cir.1982). While the editorial is certainly critical of the NRA's opposition to gun control, it is not capable of the interpretation suggested by Plaintiff, and does not expose the NRA to ridicule, hatred, or contempt, or injury in its profession. *Cleveland Leader Printing Co. v. Nethersole,* 84 Ohio St. 118, 95 N.E. 735 (1911).

**27.** In any event, under the circumstances of the present case, the applicable Ohio law would appear to be similar, if not identical to the constitutional standards set forth in *New York Times* and its progeny. *See, Dupler v. Mansfield Journal Co.,* 64 Ohio St.2d 116, 413 N.E.2d 1187 (1980), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 973 (1981) (applying *New York Times* actual malice standard in case involving public official).

that the actual malice standard should apply not only to public officials but also to "'public figures' whose views and actions with respect to public issues and events are often of as much concern to the citizen as the attitudes and behavior of 'public officials.'" *Id.* at 162, 87 S.Ct. at 1995 (Warren, J. concurring). *Accord, Gertz, supra,* 418 U.S. 323, 335–336 & n. 7, 94 S.Ct. 2997, 3005 & n. 7, 41 L.Ed.2d 789 (1974).

The actual malice standard was further elaborated upon by the Supreme Court in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Therein, the Court reviewed the malice requirements articulated in previous decisions, which had mandated a "showing that a false publication was made with a 'high degree of awareness of ... probable falsity' ..., [or] evidence of either deliberate falsification or reckless publication 'despite the publisher's awareness of probable falsity,'" *id.* at 731, 88 S.Ct. at 1325 (citations omitted). The Court then concluded that:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.* Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731, 88 S.Ct. at 1325 (emphasis added).

In the present case, because the NRA has conceded, at least for the purpose of this litigation, that it is a public figure, there is no need to discuss the NRA's status in detail. *See,* Doc. # 14, p. 22.[28] Since the protective umbrella of *New York Times*

thus applies, the issue left remaining for consideration is whether, accepting as true Plaintiff's version of *disputed* facts, a "reasonable jury *could* find malice with convincing clarity," that is, has Plaintiff made "a clear and convincing showing, which may be by circumstantial evidence, of defendant's actual state of mind—[that state of mind being] either subjective awareness of probable falsity or actual intent to publish falsely." *Yiamouyiannis, supra,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980) (citations omitted) (emphasis in original) (parenthetical material added).

Before turning to a substantive analysis of whether malice has been demonstrated with convincing clarity under the facts submitted herein, a few comments are in order. Although the Court in *Yiamouyiannis* indicated that factual disputes should be resolved in the plaintiff's favor, that process significantly differs from transforming undisputed matters into factual disputes by accepting a party's unsubstantiated version of claimed "facts." To briefly illustrate this point, attention may be directed to the issue of the NRA's financing, which has been previously considered in some detail. Based on the Court's review of the materials filed by the parties, it was apparent that no factual dispute existed regarding the editorial statement that the NRA was financed by firearms manufacturers and by "shooters." To the extent that this statement could be classified as factual or based on fact, rather than opinion, the Court determined that the factual predicate for the statement was true. At this juncture, it would be logically inconsistent to assume that this statement is false, and to thus consider as Plaintiff suggests, whether De-

28. In *Gertz,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court stated, with respect to public figures, that:

> For the most part, those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event they invite attention and comment.

*Id.* at 345, 94 S.Ct. at 3009. Under this definition, it is clear that the NRA is, at the least, a limited issue public figure, in view of the fact that the NRA has chosen to influence gun control legislation by intensive political lobbying.

fendant Riesz acted with actual malice because he did not conduct a specific investigation into the NRA's financing, but instead relied upon his recollection of seeing firearms advertised in *The American Rifleman*. *See,* Doc. # 14, pp. 17–18.[29] It is apparent that Riesz could not have entertained doubt about the accuracy of a statement which was true. Given these facts, it would obviously be illogical beyond peradventure to conclude that Riesz or any other Defendant acted with actual malice in publishing the statement about the financing of the NRA. *New York Times* does not impose upon defendants the burden of establishing truth, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964). From this fact, however, it does not, therefore, follow that where truth has been discovered, it need be disregarded.

The same conclusion is mandated with regard to the remaining "facts" set forth by Plaintiff to satisfy the required showing of actual malice. Specifically, Plaintiff objects to false statements of fact in the editorial to the effect that the NRA promotes the right to sell guns to known assassins; that the NRA encourages murder and robbery; and that the NRA sells guns. *See,* Doc. # 14 pp. 19–22. Based on its extraction of these alleged false statements from the content of the editorial, and upon the fact that Defendants knew, for example, that the NRA did not literally encourage murder and robbery, Plaintiff contends that actual malice has been demonstrated. However, as has been previously noted, at length, the language of the editorial is incapable of being reasonably construed in the manner suggested by Plaintiff. Moreover, the statements to which objection has been made either are opinions, or are true to the extent they are factual, as was the case with the comment concerning the fi-

nancing of the NRA. Like the plaintiff in *Loeb v. New Times Communications Corp.,* 497 F.Supp. 85 (S.D.N.Y.1980), the NRA "[i]n essence, . . . relies upon the character and content of the publication to support . . . [its] claim that defendants acted with reckless disregard of the truth. This, however, is a constitutionally impermissible evidentiary basis for a finding of actual malice." *Id.* at 93 (citation omitted).

The evidence of record, rather than indicating that Defendants acted with actual malice, reveals that customary editorial procedures were followed in the preparation, publication, and reprinting of the editorial. Arnold Rosenfeld, the Editor of the Dayton Daily News, indicated that the Dayton Daily News had long adhered to a general policy of advocating gun control, with particular emphasis on "local, state, national restrictions for registration of handguns, for the banning of their manufacture, their importation, their sale, whatever can simply get them off the streets and out of [the] hands of people who should not be having deadly weapons of this sort." Rosenfeld deposition, pp. 13–14.[30] According to Rosenfeld, after the development of the paper's broad political policy, "day-to-day policy is generally brought up and conceived . . . in a series of daily editorial board meetings . . . in which members of our editorial board meet and describe the issues, talk about the issues, and assignments are made in a very casual way about writing." *Id.* at 5.

Once an editorial has been written, it is reviewed for content and grammar by Thomas Teepen, the Editor of the Dayton Daily News editorial pages. Teepen deposition, pp. 1, 6, and 7. After Teepen's editing is completed, and after composition and review of the editorial's headline, Teepen then, in the majority of cases, approves the

---

**29.** In any event, the Supreme Court has indicated that "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Gertz, supra,* 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). Thus, even had it been appropriate to consider whether Riesz acted with actual malice, the very utmost which might have been said is that

he may have failed to investigate the matter of the NRA's financing.

**30.** In fact, Albert Cawood, editorial writer for the Dayton Daily News, indicated that the gun control policy was already generally established by 1966 when he first was employed by the paper. *See,* Cawood deposition, pp. 2, 3.

editorial for publication. *See, id.* at 7. Although the staff members who were deposed had difficulty recalling the precise content of the editorial meeting in which the potential Norval Morris editorial was discussed, there is no indication that anything other than the routine procedures were followed in connection with the preparation and publication of that editorial. Charles Riesz, the Dayton Daily News editorial writer who authored the editorial, indicated that in preparing the editorial, his sources of information included: stories he had read about Morris' testimony in the *New York Times,* the *Washington Post,* the *Congressional Quarterly,* and the *Wall Street Journal;* his recollection of Neil Knox's testimony during Morris' nomination hearing; and his personal knowledge of the lobbying activities of the NRA, based on his previous employment with the *Congressional Quarterly. See,* Riesz deposition, pp. 18–19, 30, 56, and 60–61. Riesz further indicated that in writing editorials, the normal procedure was to consult and rely upon "current, presumably reliable news accounts of the event." *Id.* at 48. Regarding these accounts, Riesz stated:

> [T]hat information is grafted onto a base of information and research that goes back over the years that has produced our general stance on the issue. And so, then, the latest information is an opportunity to comment on, restate, redefine, amplify that long-standing position. And so that was the way this one was written.

*Id.* at 48–49.

The testimony of Thomas Teepen also reflects a similar understanding of the customary approach to editorial writing and the application of that method in the present case. Thus, during Teepen's deposition, the following exchange occurred:

> Q: When you edited Mrs. [sic] Riesz' editorial . . ., did you go to the librarian and ask for the gun control file or the NRA file or any file or any collection of papers?
>
> A: Of course not.
>
> . . . .

> [W]e had already discussed the issue. It is not typical or customary practice for an editor in any position to take each piece of copy that he or she is editing and retreat into a cell to review everything that has been published before on that topic.
>
> Q: Well how do you verify an editorial's accuracy or statements? . . .
>
> A: We had done reading on the immediate issue that this piece addresses from sources that I've already mentioned to you several times. We had held discussions of our judgment of those at the editorial board meeting as I have explained. And I read the piece with those in mind, and again the background of long established and clearly held Dayton Daily News editorial policy and opinion on this and like issues.

Teepen deposition, p. 61. Teepen further recalled that "in the editorial board discussion it was plain from Mr. Riesz's conversation that he had, in fact, done reading on this issue." *Id.* at 18.

Additional support for the above statements may be found in Rosenfeld's testimony, wherein he indicated that the editorial was considered merely "additional comment" on established policy rather than development of new policy which would require research. Rosenfeld deposition, pp. 13–15. *See also,* Fenley deposition, pp. 12–13. Rosenfeld also stated that while he sometimes became personally involved in editing, it was customary for him to accept Teepen's judgment on editorials such as the present, which were not being given a great deal of emphasis. *See,* Rosenfeld deposition, at 16–18. Moreover, Joseph Fenley, the managing editor of the Dayton Daily News, indicated that the newspaper would not ordinarily verify wire stories or information received from wire services. *See,* Fenley deposition, at 20. Fenley testified that occasionally further investigation would be done, particularly when the matter was of local concern. Fenley mentioned such a local case, and then commented: "since it was intensely local, we did more than just run the wire service. It was not that we had any lack of faith in the accura-

cy of the wire services. They are highly respected news organizations, run by professionals. That's their function." *Id.* at 20–21.[31]

Under the preceding analysis, it is clear that the Dayton Daily News staff did not deviate from accepted, normal procedures in preparing and publishing the Norval Morris editorial. Moreover, there is no indication in the affidavits or depositions submitted herein that any of the Defendants connected with the Dayton Daily News "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).[32] It is likewise apparent that the Springfield Daily News and its staff did not reprint the Dayton Daily News editorial with awareness of its probable falsity. Loren Schultz, the editor of the Springfield Daily News editorial page, testified that at least since 1942, the Springfield Daily News had customarily reprinted editorials taken from the Dayton Daily News. Schultz deposition, pp. 3, 6, and 7. *See also,* Teepen deposition, p. 58.[33] Schultz indicated that the Springfield paper engaged in this practice because it did not have the equipment and staff to prepare all of its own editorials. *See,* Schultz deposition, at 6. Schultz further stated that the Springfield Daily News did not use editorials verbatim from other newspapers, but did use the Dayton Daily News editorials "because of our association with the Dayton Daily News, which has gone through many, many years." *Id.* at 7.

In addition to demonstrating that the publication of the Morris editorial was in

---

**31.** The testimony of George Martin, Executive Director of Publications for the NRA, further illustrates that it is customary practice to use information from other newspapers and publications without independent verification. Martin indicated that clippings from magazines and newspapers are used in a section of *The American Rifleman* called "The Armed Citizen." *See,* Martin deposition, pp. 46–47. When Martin was asked whether he took steps to check the reliability of those clippings, he stated "*[w]e depend on the accuracy of the paper that it is taken from.*" *Id.* at 48 (emphasis added). Martin was then questioned with regard to whether he found "that usually pretty accurate," to which he responded, "[t]o my knowledge, we have not been challenged." *Id.*

It is also interesting to note that editorial commentary prepared by the ILA is routinely published in the "Official Journal" section of *The American Rifleman. See, id.* at 31–33, and Martin deposition Ex. 1. It is apparent from Martin's testimony that the staff of the *Rifleman* plays an extremely limited role in editing or altering the material submitted by the ILA. *See,* Martin deposition, at 34–35. In fact, Martin's comments indicate that the editing, if any, done by the *Rifleman* staff is not of a substantive nature, but instead relates merely to limiting the article's length to conform to the space available. *See, id.*

**32.** There is a factual dispute about whether the NRA opposes the decriminalization of "victimless crimes," or whether that is merely a personal opinion of Neil Knox, the NRA spokesman who appeared at the Morris hearing in Washington, D.C. *Compare,* Knox deposition, pp. 50–52 and Riesz deposition, pp. 30–31 and 38. However, assuming *arguendo* that the NRA does not oppose the decriminalization of "victimless" crimes, and that such a position is advocated only personally by Mr. Knox, this dispute is not a *material* one in relation to the presence of actual malice, because there is no indication that Riesz or any other defendant entertained serious doubt about the truth of this matter at the time of publication. In fact, even at the time of his deposition, which was taken approximately seventeen months after the publication of the editorial, Riesz was still under the impression that the NRA itself was opposed to the decriminalization of "victimless" crimes. Thus, the following exchange occurred during Riesz' deposition:

> Q: And do you know why the NRA and in particular, Mr. Knox, opposed Mr. Morris' nomination and confirmation?
> A: *From what Mr. Knox said, the NRA felt that his positions on victimless crimes were not acceptable to the NRA.*

*Id.* at 38 (emphasis added). Riesz further indicated that the NRA's position on law enforcement, as reflected by Knox's testimony, was that the NRA was for strict enforcement of the laws, and that Knox "did not agree with Mr. Morris on the decriminalization of, quote, 'victimless crimes.'" *Id.* at 30–31.

**33.** Schultz has been employed by the Springfield Daily News only since 1942. He indicated that he was positive that the practice of reprinting Dayton Daily News editorials in the Springfield paper had occurred prior to 1942. *See,* Schultz deposition, pp. 1–2 and 7–8. At the very least, Schultz's testimony reveals a routine tradition existing for approximately thirty-six years prior to the publication in question.

accordance with the established practice of the Springfield Daily News, Schultz's testimony reveals that he was familiar with the subject matter of the editorial, including the specific matters upon which the NRA has premised its claims. *See, id.* at 14–16, 19–20, and 26. While Schultz did not verify the information contained in the editorial, such an omission, at most, would constitute only a failure to investigate, and would be insufficient to establish the presence of actual malice. *See,* footnote 29, *supra.* However, given the fact that Schultz was knowledgeable about the content of the editorial, it would be unwarranted to consider that he acted even negligently in failing to verify the information contained therein. Moreover, there is a total absence of any evidence which would indicate that Schultz was aware of the probable falsity of the editorial or entertained serious doubts as to its truth. Thus, based on the undisputed facts disclosed herein, and construing all inferences in Plaintiff's favor, there is no evidence upon which a jury could reasonably find with convincing clarity that either the Springfield Daily News or the Defendant employees of that newspaper acted with actual malice in reprinting the editorial first published in the Dayton Daily News.[34]

III. *Conclusion*

Based on the preceding analysis, the Court finds as follows:

1. The publication and reprinting of the editorial regarding the NRA's opposition to the nomination of Norval Morris as head of the Law Enforcement Assistance Administration is absolutely protected as opinion under *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974);

2. The false statements of "fact" objected to by Plaintiff are not factual statements. To the extent they may be factually predicated, the statements are true, are not based upon undisclosed defamatory facts, or are incapable of the defamatory interpretation advanced by Plaintiff;

3. Assuming *arguendo* that the editorial is not protected under the above theories, there is no evidence to support a finding that any of the Defendants acted with actual malice in preparing, publishing, or reprinting the editorial.

WHEREFORE, the motion for summary judgment filed by all Defendants is sustained in its entirety, and summary judgment is therefore granted in favor of all Defendants and against the Plaintiff, the National Rifle Association.

The Clerk of Courts is to enter judgment for the Defendants.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

**34.** Although the executive editor and the general manager of the Springfield Daily News did not recall reading the editorial before it was reprinted, nothing untoward can be inferred from this, in view of the fact that Schultz appears to have routinely exercised control over editorial content, with only infrequent exceptions. *See,* Hibbett deposition, pp. 5–6 and Swaim deposition, p. 3. In fact, both Swaim and Hibbett indicated that Schultz had authority to clear editorials for publication without consulting either of them. *See,* Hibbett deposition, at 9, and Swaim deposition, at 3–4. Accordingly, while these Defendants did not approve the editorial prior to publication, no actual malice can be inferred from their lack of participation.