**DISSENT and Opinion Filed October 25, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00988-CV**

**MARK LEE DICKSON AND RIGHT TO LIFE EAST TEXAS, Appellants**
**V.**
**THE AFIYA CENTER AND TEXAS EQUAL ACCESS FUND, Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-08104**

## DISSENTING OPINION FROM DENIAL OF *EN BANC* RECONSIDERATION

Opinion by Justice Schenck

The Constitution forbids all three branches of government from suppressing or proscribing speech, particularly speech on matters of public concern and debate. The state and the state courts may not deploy tort law to achieve that purpose without violating our own constitution and the First and Fourteenth Amendments of the federal Constitution. Because the plaintiffs' claims in this case seek to suppress and punish speech any reasonable observer would see as a criticism of past judicial decision-making, I believe it is especially perilous to overlook the obvious implications this suit has to the First Amendment and the judiciary alike. The

legislature has directed us to be on the watch for such efforts and to bring them to a prompt halt with reimbursement of the interim costs. I would follow that direction.

## I.

When does life begin for purpose of its recognition under the states' police powers and protections—conception, viability, birth, or some other time? Is the federal Constitution properly read to include a right to privacy that forecloses the states' plenary power to answer those questions in the rough and tumble political process associated with the legislative process? And, in answering that second question in *Roe v. Wade*, did the United States Supreme Court remove the answers Texas gave to the first question both from its law books and its permitted public discourse?

All but the last of these questions have intensely divided public and legal opinion alike for four decades. It will likely come as a surprise to many, then, that by framing the last question as one of fact actionable (and suppressible and punishable) under state tort law, these first two questions are set to be answered in a civil jury trial in a Dallas County district courtroom.

Until recently, perhaps, no one would seriously doubt that citizens had the absolute right to differ with their government, and not only to think their own

thoughts about when life begins,[1] but to speak them aloud in the form of disagreeing with judicial pronouncements—even ones venerated by what would be the other side of a political debate—such as the controversial holding in *Roe.* Nevertheless, this lawsuit unavoidably seeks to penalize[2] a statement premised on the opinion that life begins at some point prior to the moment that *Roe* and its progeny permit the state's interest in protecting the potential for life to control.[3] Our panel opinion turns aside the Texas Citizen's Participation Act's ("TCPA") appeal seeking recognition and protection of the free speech implications this case presents.

As detailed below, I disagree with the panel's holding. Accordingly, I dissent from the Court's denial of appellants' request for *en banc* reconsideration.

## II.

This appeal originated from the trial court's denial of appellants Mark Lee Dickson ("Dickson") and Right to Life East Texas's ("RLET") Motion to Dismiss appellees' defamation and conspiracy to defame claims under the TCPA. Dickson is opposed to abortion and has encouraged cities throughout Texas to enact

---

[1] Justice Blackmun's majority opinion in *Roe* appeared to concede that no one—not even the United States Supreme Court (or presumably a jury)—could answer the question of when life begins as a matter of fact. "When those trained in the respective disciplines of medicine, philosophy, and theology are unable to arrive at any consensus, the judiciary, at this point in the development of man's knowledge, is not in a position to speculate as to the answer." 410 U.S. 113, 159 (1973).

[2] The plaintiffs' petition in this case seeks "punitive damages in an amount of more than $300,000[]." Pet. at 20. The jury will presumably be instructed that it "may in its discretion award [an amount] as a penalty or by way of punishment." *See* TEX. PATTERN JURY CHARGE 115.38.

[3] As noted, the *Roe* majority declined to answer the question of when life begins, preferring to rest its holding on the weighing of the right to privacy it recognized against the state's compelling interest in the potential for life, with state power preserved after "viability." 410 U.S. at 165–66. Whether that factual and legal analysis is correct has been a matter of sharp public debate since.

–3–

ordinances that outlaw abortions within their city limits. The City of Waskom enacted such an ordinance. Following the Waskom's enactment of the ordinance, Dickson and RLET made various comments about abortion and the Waskom's enactment of an ordinance declaring abortion illegal within the city's limits.[4]

---

[4] The complained of statements are as follows:

(1) Dickson's drafting and advocating for the passage of the original ordinance, which banned appellees from operating within city limits and declared them to be "criminal organizations."

(2) Dickson's posting of the following statement on Facebook on July 2, 2019.

"Abortion is Freedom" in the same way that a wife killing her husband would be freedom— Abortion is Murder. The Lilith Fund and NARAL Pro-Choice Texas are advocates for abortion, and since abortion is the murder of innocent life, this makes these organizations advocates for the murder of those innocent lives. This is why the Lilith Fund and NARAL Pro-Choice Texas are listed as criminal organizations in Waskom, Texas. They exist to help pregnant Mothers murder their babies.

(3) RLET's posting of a similar statement from Dickson on Facebook that reads as follows:

As I have said before, abortion is freedom in the same way that a wife killing her husband is freedom. Abortion is murder. The thought that you can end the life of another innocent human being and not expect to struggle afterwards is a lie. In closing, despite what these groups may think, what happened in Waskom was not a publicity stunt. The Lilith Fund was in error when they said on a July 2nd Facebook post, "Abortion is still legal in Waskom, every city in Texas, and in all 50 states." We said what we meant, and we meant what we said. Abortion is illegal in Waskom, Texas. In the coming weeks more cities in Texas will be taking the same steps that the City of Waskom took to outlaw abortion in their cities and become sanctuary cities for the unborn. If NARAL Pro-Choice Texas and the Lilith Fund want to spend more money on billboards in those cities we welcome them to do so. After all, the more money they spend on billboards the less money they can spend on funding the murder of innocent unborn children.

(4) Dickson's posting of the following statement on Facebook on November 26, 2019:

Nothing is unconstitutional about this ordinance. Even the listing of abortion providers as examples of criminal organizations is not unconstitutional. We can legally do that. This is an ordinance that says murdering unborn children is outlawed, so it makes sense to name examples of organizations that are involved in murdering unborn children. That is what we are talking about here: The murder of unborn children. Also, when you point out how the abortion restrictions in 2013 cost the State of Texas over a million dollars, you should also point out how many baby murdering facilities closed because of those restrictions. We went from over 40 baby murdering facilities in the State of Texas to less than 20 baby murdering facilities in the State of Texas in just a few years. Even with the win for abortion advocates

–4–

Given this context of an ongoing and heated national debate over *Roe* and a controversial local ordinance related to that debate, one would assume that our common law would not attempt to regulate speech about either the validity of the ordinance or the Supreme Court decision it confronts, or to "penalize" either viewpoint in that debate, but would instead assiduously constrain its reach to avoid those constitutional thickets. *Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 13 (1970) ("This case involves newspaper reports of public meetings of the citizens of a community concerned with matters of local governmental interest and importance. The very subject matter of the news reports, therefore, is one of particular First Amendment concern.").

---

with Whole Woman's Health v. Hellerstedt, how many baby murdering facilities have opened back up? Not very many at all. So thank you for reminding us all that when we stand against the murder of innocent children, we really do save a lot of lives.

(5) Dickson's posting of the following statement on Facebook on June 11, 2019, shortly after Waskom adopted the sanctuary-cities ordinance, and RLET's re-posting of this statement on Facebook:

Congratulations Waskom, Texas for becoming the first city in Texas to become a "Sanctuary City for the Unborn" by resolution and the first city in the Nation to become a "Sanctuary City for the Unborn" by ordinance. Although I did have my disagreements with the final version, the fact remains that abortion is now OUTLAWED in Waskom, Texas! . . . . All organizations that perform abortions and assist others in obtaining abortions (including Planned Parenthood and any of its affiliates, Jane's Due Process, The Afiya Center, The Lilith Fund for Reproductive Equality, NARAL Pro-Choice Texas, National Latina Institute for Reproductive Health, Whole Woman's Heath and Woman's Health Alliance, Texas Equal Access Fund, and others like them) are now declared to be criminal organizations in Waskom, Texas. This is history in the making and a great victory for life!

(6) Mr. Dickson's utterance of the following statement during an interview with CNN:

The idea is this: in a city that has outlawed abortion, in those cities if an abortion happens, then later on when Roe v. Wade is overturned, those penalties can come crashing down on their heads.

–5–

As detailed below, I do not believe our law does or should reach these statements or attempt to subject them to the penalties sought below for uttering them. Further, had the legislature not already directed us to so declare and promptly, I believe the federal and state constitutions would compel us to act on our own account.

**III.**

**I.     THE TCPA AND COMMON LAW DEFAMATION**

Our panel does an excellent job of identifying the statements at issue and considering their potential for a favorable verdict if the statements may be treated as questions of fact. So far as it goes, I agree with the panel's treatment of the issues; but the first and most immediate problem is fairly pedestrian: does the common law[5] recognize a viable claim here?

Our sister court in Amarillo has examined the very controversy presented in this case and has determined that the speech involved here falls within the TCPA and that the plaintiffs cannot make out the prima facie case that the statute would require to permit the case to proceed. *See Dickson v. Lilith Fund for Reprod. Equity*, No. 07-21-00005-CV, 2021 WL 3930728 (Tex. App.—Amarillo Sept. 2, 2021, no pet. h.) (mem. op.). I agree in full with my colleagues' analysis there and will

---

[5] The legislature has codified this law in Chapter 73 of the Civil Practice & Remedies Code.

address it primarily in relation to my broader concern that a contrary reading would implicate the First Amendment.

### A. *The Defamation Standard Should Not Be Applied or Expanded to Function as a Restraint on Protected Political Speech*

Dickson's statements decrying appellees' promotion of abortion procedures as "murder" and their activities as "criminal" clearly amount to opinion or rhetorical hyperbole,[6] as our colleagues in Amarillo have explained. *Lilith*, 2021 WL 3930728, at \*6; *see also Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 795 (Tex. 2019); *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App.—Dallas 2015, pet. denied). Whether an utterance is an opinion or rhetorical hyperbole turns not on what the speaker intended but what a reasonable person would believe and presents as a question of law for the court to decide. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989). It is of no moment whether one parses the issues as part of the plaintiffs' case or as an affirmative defense. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(d); *Baumgart v. Archer*, 581 S.W.3d 819, 825 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

---

[6] Rhetorical hyperbole is extravagant exaggeration that is employed for rhetorical effect. A person of ordinary intelligence would perceive appellants' words as nothing more than rhetorical hyperbole. To the extent appellants' comments express their views that abortion should be considered murder, that is their opinion on the morality and legality of abortion. Under the entire context of the conversation being had, appellants' accusations are rhetorical hyperbole or opinions on a hotly debated topic of public concern and is protected speech under the Constitution.

The panel, however, treats both statements as actionable statements of fact for which the defendants must stand trial and face potential punishment, notwithstanding the potential chilling effect either might have on their or others' speech. In doing so, the panel, unintentionally I suspect, embraces a reading of our defamation law that would extend it to opinion and rhetorical hyperbole, and constitutional infirmity, as detailed below.

### 1. Courts and Juries Are Not Equipped to Decide Political Disagreements

As we ponder the reach of our state tort law, we should recall that Dickson is hardly alone in expressing himself in forceful or hyperbolic ways about public matters[7] like the municipal ordinance at issue here. Suppose, just by way of example, someone was to take to an international medium viewable from any part of the state to declare that Texas Governor Greg Abbott is "a psychopathic murderer."[8] While the Governor as a public figure would be required to show heightened scienter as to falsity, regardless of the venue, rural or urban, the underlying defamation claim would be the same. That court would thus face the same question we have here: would a reasonably intelligent listener understand this

---

[7] Examples abound. Recently, Press Secretary Jen Psaki accused South Carolina Governor Henry McMaster of "literally killing people" by not welcoming the federal government sending its workers or volunteers door-to-door to engage its citizens relative to the COVID-19 vaccine. An Oklahoma school board member said kids could "commit murder" by not wearing masks in school. Would listeners understand these statements in their context as part of a public debate, albeit a heated one? *See also Nat'l Rifle Ass'n v. Dayton Newspapers, Inc.*, 555 F. Supp. 1299 (S.D. Ohio 1983) (statement that National Rifle Association "happily encourages . . . murders and robberies" was protected opinion).

[8] https://www.youtube.com/watch?v=3l263xKfLV8

statement to be one of fact or political hyperbole or relating to an ongoing debate over challenging public health policy questions? A question of "fact" in Dallas is a question of fact in Cut and Shoot as well. Are we to have rural and urban juries with varying views on the issue of abortion deciding whether speech concerning same is actionable, potentially coming to different conclusions?

Given the propensity any merits judgment in this case would have to foment, rather than resolve, civil conflict and to politicize the judiciary, I would favor a reading of our defamation law that would avoid the constitutional conflict that would stem from reading any of these statements as "factual" as opposed to political hyperbole. This would leave the political debate on the floors of the legislative bodies and in the town squares where the remedy of further speech is freely available, permitting the judiciary to play a more sober role only where unprotected and provably false, genuine factual assertions are involved. *Cf. Fam. Planning Spec. v. Powers,* 46 Cal. Rptr. 2d 667 (Cal. Ct. App. 1995) (suit brought by doctors identified by name in pamphlet and said incorrectly to employ a gruesome form of late-term, partial breech extraction).

As a contrary reading increases the prospect for lawsuits on a myriad of topics already boiling amongst a polarized nation over which the Constitution assures the various points of view a voice free from judicial suppression, short of imminent threats of violence or incitement of riots, I would not construe such statements as potentially actionable under our defamation law. Our reading of the substantive law

to the contrary insufficiently considers the chilling effect such litigation (or threats of it) would have on protected political speech.[9]

## 2. What Will Our Jury Be Answering Here, If Not Questions of Opinion and Permissible Political Viewpoints?

Obviously, the political and jurisprudential debates over *Griswold*'s recognition of a right to privacy and *Roe*'s application of it to abortion are not questions state courts are capable of resolving. In my view, however, further injecting the judiciary into that debate[10] is inappropriate and inadvisable—particularly in a state that has chosen partisan election of its appellate judiciary. And, yet, by attacking statements challenging *Roe*'s validity (and defending an ordinance doing the same) as false statements of fact, this seems unavoidably to be the path this case has set for us.

---

[9] I take judicial notice that the internet provides a national and indeed international medium for the dissemination of political rhetoric. Venue in defamation cases can arise as readily in Massachusetts as in Alabama, and the expense of defending a tort claim in remote forums may be enormous. *Internet Sols. v. Marshall,* 39 So. 3d 1201 (Fla. 2010). The notion that juries (and judges) in these states might deploy their laws to punish and suppress locally unpopular political views is hardly fanciful, and precisely why the federal Constitution (as well as those of the states) protects the debate from the cudgel of litigation and the attendant threat and expense it entails. While the Supreme Court has recognized these concerns are real, they are not embodied in due process, personal jurisdiction protection. Instead, "the potential chill on protected First Amendment activity stemming from libel and defamation actions is [supposed to be] already taken into account in the constitutional limitations on the substantive law governing such suits." *Calder v. Jones,* 465 U.S. 783, 791 (1984). I believe that consideration operates in both directions, and that state libel and defamation standards should strive to avoid constitutional conflict. *Cf. City of Fort Worth v. Rylie,* 602 S.W.3d 459 (Tex. 2020). Whether the law here is developed by courts or by statutes, we should read it with an eye toward the Constitution and our role under it.

[10] Of course, critics charge the recognition of an extra-textual right to privacy in *Griswold v. Connecticut*, 381 U.S. 479 (1965), (and *Roe*'s application of it) as having the same effect of politicizing judicial review. *Roe*, 410 U.S. at 152 ("The Constitution does not explicitly mention any right of privacy"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 1002 (1992) (Scalia, J., dissenting). As state judges have no say in that debate, I merely note it here and suggest that further digging is what people in holes should not do.

Dickson's statements are no doubt pointed and offensive to his targets. Believing as he does that life begins at conception, he decries their advocacy of abortion services as "murder." And, urging that Texas statutes criminalizing the procedure remain unrepealed, if unenforceable, and that the act of performing any abortion is a "crime," he thus decries the enterprise as a "criminal organization."

To be actionable, however, these statements must be both factual and incorrect. Again, the statement's intended effect on the listener is not part of the analysis. *See Carr*, 776 S.W.2d at 570. Unless our jury is to answer when life begins or opine on the jurisprudential correctness of *Roe*, how are these statements to be weighed as "factual" matters at all, rather than matters of opinion or rhetorical hyperbole (leaving aside their political or protected nature for the moment)? I believe that any reasonable observer would view them as opinion and rhetoric *and* that the TCPA requires justices on appeal to make that judgment if the statute is to have its intended effect.

But what of the statement that the plaintiffs are "criminal organizations" presumably involved in a crime? Is not the accusation of criminal conduct a statement of fact and defamatory? That may be, but what then is the factual "crime" that Dickson ascribes to the plaintiffs? If one wishes to engage in the debate over whether the Texas statutes regarding murder remain extant but dormant, how is that a factual, rather than legal inquiry? Why or how would a jury ever be empowered

–11–

to give a helpful answer to that question?  How would a jury be instructed to answer that question?[11]

Ignoring the antecedent logical problem of what crime an observer would ascribe from Dickson's statements, the answer to the factual component of that question (if there is one) is obvious: the "crime" is "murder."  Dickson helps us with that as he says as much directly.  That position, obviously, is grounded in his opinion that life begins at conception—a view even the majority in *Roe* saw as incapable of being proven in a court of law.  410 U.S. at 159; *Benton,* 94 S.W.3d at 580.  The constitution protects Dickson's right to state his opinion that life begins at conception and, as a result, that abortion is murder.

To suggest that the statement that "abortion is murder" is protected as a statement of opinion or rhetoric but that it is a "crime" is not protected strains comprehension.  To be sure, jurors could be exposed to the esoteric legal debate over the authority of federal courts to strike down (rather than declare unenforceable) state laws.  But, ignoring that this is not a "factual" matter at all, even the effort to put this issue and speech on trial risks the appearance of the judiciary quashing dissent and opposition to its own work product.  Citizens have the right to disagree with Supreme Court holdings.  Having the state judiciary adjudicate and declare the speech to be unlawful and punishable risks the resulting trial resembling a seditious

---

[11] Would a juror believing life begins at birth be empowered to award actual and punitive damages on the basis of that understanding?  And, regardless of how a jury arrives at a favorable verdict, how would it be perceived by those wishing to express a view on this hotly debated topic other than as a judicial threat?

libel case—one brought to punish unlawful speech critical of and seeking to alter their government. This form of libel, of course, was the one form thought to directly be prohibited by the First Amendment from the outset. *New York Times Co. v. Sullivan,* 376 U.S. 254, 295 (1964) (Douglas, J., concurring) ("[S]ince the adoption of the Fourteenth Amendment a State has no more power than the Federal Government to use a civil libel law or any other law to impose damages for merely discussing public affairs and criticizing public officials.").

Because the challenged statements in this case are opinion and rhetoric, they should not be actionable at common law. *Lilith*, 2021 WL 3930728 at *3.

## B. *The TCPA Requires Us to Consider the Free Speech Concerns This Case Presents*

The TCPA is found in a chapter of our civil practice and remedies code titled "Actions Involving the Exercise of Certain Constitutional Rights." *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–27.011. I believe we are obliged under that statute to consider and make a judgment (quickly) about whether the case may go forward. As our supreme court has said: "The TCPA's purpose is to identify and summarily dispose of lawsuits designed only to chill First Amendment rights, not to dismiss meritorious lawsuits." *In re Lipksy*, 460 S.W.3d 579, 589 (Tex. 2015) (orig. proceeding). Necessarily implied in that binary formulation is the notion that the former cannot be the latter: speech likely to be understood as political debate and

–13–

protected as such *is protected* by the federal and state constitutions and *is not* the makings of a meritorious lawsuit.

I understand that this has the effect of depriving the plaintiffs of the potential fruits of a jury's assessment, but this is precisely what the TCPA and the Constitution command of us, lest the prospect of juries and the costs of litigation be deployed as a tool of suppression of protected speech with the judiciary facilitating the suppression. As the broad language of the TCPA has compelled us to struggle with and recognize seemingly incompressible applications of its scope, finding it to apply here but not to cover the speech at issue leaves the act with no center.

## II. EVEN COMMON LAW SPEECH RESTRAINTS RAISE CONSTITUTIONAL IMPLICATIONS THAT WE CANNOT AVOID.

Appellants urge that continuation of this lawsuit would impinge on their constitutional right to free speech. I agree. As noted, I believe that this concern informs the reach of the substantive defamation law and is embraced by the TCPA. But, even if the TCPA did not already direct us to consider that question, I believe we would be compelled to do so directly given the constitutionally protected speech interests at stake here.

I assume that no one would contend that the speech at issue in this case could be foreclosed by an injunction, as the Supreme Court has already so held. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 760, 775 (1994) (signs displayed in front of doctor's home decrying him as a "baby killer" protected). The

question, then, is whether our tort law can be read to permit a claim for actual and punitive damages after the fact in light of its effect on protected speech.

Both the United States Constitution and the Texas Constitution protect freedom of expression. The First Amendment applies to the states through the Fourteenth Amendment. *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996). The Supreme Court has made clear that state "judicial action is to be regarded as action o[f] the State for the purposes of the Fourteenth Amendment" as a general matter. *Shelley v. Kraemer*, 334 U.S. 1, 15 (1948). Thus, actions within state courts, including and especially those targeted at protected speech, constitute state action subject to First and Fourteenth Amendment scrutiny. *Fla. Star v. B.J.F.*, 491 U.S. 524, 541 (1989); *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110 (11th Cir. 1992).

Even in its present interlocutory posture, this case mirrors the question posed in *New York Times Co. v. Sullivan:*

> Although this is a civil lawsuit between private parties, the [Texas] courts have applied a state rule of law which [defendants] claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that the law has been applied in a civil action, and that it is common law only, though supplemented by statute. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.

376 U.S. at 283.

The constitutional safeguard afforded by the First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social

–15–

changes desired by the people. *Id.* at 269. Even if the state's defamation law purported to reach to and proscribe rhetoric or purported to leave its recognition to a jury,[12] the judiciary cannot be used to constrain speech on a matter of public concern by subjecting the speaker to liability for civil damages. *Greenbelt*, 398 U.S. at 13–14; *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002) (Constitution protects rhetorical hyperbole made in debate over public matters). It makes no difference if the speech is critical or offensive to its listener. Popular speech needs no protecting, and there is no right to not hear critical or offensive speech. *See Boos v. Barry*, 485 U.S. 312, 322 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.").

Speech consisting of rhetoric on matters of public concern and likely to be so understood in the perception of a reasonable person is protected under the Constitution. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990); *Bentley*, 94 S.W.3d at 579; *see also* 1 Rodney A. Smolla, *Law of Defamation* § 4:13 (2d ed. 2005) ("[A] doctor who performs abortions may be faced with the specter of protesters marching in front of his or her clinic with signs declaring that the doctor

---

[12] "[I]n cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984) (quoting *Sullivan,* 376 U.S. at 284–85).

is a 'murderer.' The word 'murder' in this context, again, is obviously not intended to be taken in its literal sense, but rather as an expression of the protesters' view that abortion is tantamount to murder.").

This protection should extend to relief not only from an adverse final judgment, but from the chilling effect of the costs of litigation prior to judgment and the interim threat of punitive damages. Treating the question as one of fact for a jury is contrary to controlling law and our obligation to make an independent appellate determination of the claims' impact on protected speech. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984); *Bentley*, 94 S.W.3d at 590. It also subjects protected speech to the chilling effects of the massive interim costs. *Cf. Christiansburg Garment Co. v. Equal Empl. Opp. Comm'n*, 434 U.S. 412, 421 (1978).[13] For that reason, even if we were not directed by the legislature to do so in the TCPA, I would recognize the need to bring this case to an end directly in view of our own constitutional guarantee of free speech and as part of the judiciary's obligation to provide for the efficient administration of justice. TEX. CONST. art. V, § 31 & art. I, § 8.

---

[13] If the prospect of shifting litigation costs in failed litigation are nevertheless sufficient to chill future potential meritorious litigation, the actual expense of defending meritless litigation is just as likely to chill future protected speech. The TCPA, of course, recognizes this serious concern and provides a direct remedy in the form of fee recoupment.

## CONCLUSION

This lawsuit seeks to chill constitutionally protected speech and advocacy. The speech involved in this case is the quintessential example of what the TCPA was enacted to protect. Juries and judges are no more able to answer the questions involved here than the body politic has been over these past decades. Any judgment entered on the merits in this case can only chill the public debate and breed resentment toward the courts.

Accordingly, I would reverse the trial court's denial of the motion to dismiss without delay and remand with instructions to award appropriate attorney's fees to the defendants. Because the panel decision directly conflicts with the holding of another court of appeals, impinges on a fundamental right, and injects the judiciary into an intractable political debate, I would grant the motion for *en banc* reconsideration.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

200988HD.P05